945 F.2d 1260
 20 Fed.R.Serv.3d 1363
 CONTRACTORS ASSOCIATION OF EASTERN PENNSYLVANIA, INC.,
General Building Contractors Association, Inc., Associated
Master Painters & Decorators of Philadelphia, Inc.,
Employing Brick Layers Association of Delaware Valley, Inc.,
Interior Finish Contractors Association, Inc., Mechanical
Contractors Association of Eastern Pennsylvania, Inc.,
Roofing and Sheet Metal Contractors Association, Inc.,
Sub-Contractors Association of Delaware Valley, Inc.,
National Electrical Contractors Association, Inc.
v.
CITY OF PHILADELPHIA, Elizabeth Reveal, as Director of
Finance for the City of Philadelphia, Curtis
Jones, Jr., as Director of the Minority
Business Enterprise Council,
United Minority Enterprise Associates, Inc., Intervening Defendant,
The City of Philadelphia, Appellant at No. 90-1295,
United Minority Enterprise Associates, Inc., Appellant at No. 90-1296.
 Nos. 90-1295, 90-1296.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1990.
Decided Sept. 30, 1991.
 
 Charles W. Bowser (argued), James P. Cousounis, Bowser, Weaver & Cousounis, P.C., and Charisse Lillie, City Sol., Philadelphia, Pa., for City of Philadelphia.
 Robert T. Vance, Jr. (argued), Brown, Vance, Jackson & Smith, Philadelphia, Pa., for United Minority Enterprise Associates, Inc.
 John J. McAleese, Jr. (argued), Thomas J. McGoldrick, John H. Widman, McAleese, McGoldrick & Susanin, P.C., King of Prussia, Pa., for appellees.
 Before GREENBERG, HUTCHINSON and HIGGINBOTHAM,* Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 The City of Philadelphia (City) and United Minority Enterprise Associates, Incorporated (Minority Associates) appeal an order of the United States District Court for the Eastern District of Pennsylvania granting appellee Contractors Association of Eastern Pennsylvania, Incorporated, and other trade associations with members that do business in the construction industry in the Philadelphia metropolitan region (collectively "Contractors"),[1] summary judgment on Contractors' claim that Chapter 17-500 of the Philadelphia Code (Ordinance), Philadelphia's public contract set-aside law, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. See Contractors Ass'n of E. Pa., Inc. v. City of Phila., 735 F.Supp. 1274 (E.D.Pa.1990). Among other contentions, Minority Associates argues that the district court erred by granting the Contractors' motion without giving Minority Associates a chance to pursue additional discovery on the existence of discrimination in the Philadelphia construction market that could justify the various set-asides in the Ordinance. Minority Associates' opposition to Contractors' motion for summary judgment was accompanied by a Federal Rule of Civil Procedure 56(f) affidavit. The affidavit stated that Minority Associates needed time to undertake further discovery. We think Minority Associates should have been given a reasonable opportunity for further discovery and will therefore vacate the district court's order granting Contractors' summary judgment and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 This appeal concerns claims Contractors made in an amended complaint dated May 19, 1989 that was filed in the district court in their suit to strike down Chapter 17-500 of the Philadelphia City Code and the regulations promulgated under that Ordinance as contrary to the United States and Pennsylvania Constitutions and federal and state statutes guaranteeing them, inter alia, equal protection of the laws. The City filed an answer as did Minority Associates, an intervening defendant. On October 11, 1989, the City moved for judgment on the pleadings or, alternately, summary judgment on the grounds that Contractors lacked standing to sue and did not state a cause of action under the Equal Protection Clause, 42 U.S.C.A. § 1983 (West 1981) and 42 U.S.C.A. § 1981 (West 1981). The City also moved for judgment on the pleadings on the state law claims alleging that if the federal claims were dismissed the court would lack pendent jurisdiction. The Contractors replied and filed a cross-motion for summary judgment on its Equal Protection Clause and section 1983 claims.
 
 
 3
 The City opposed Contractors' cross-motion for summary judgment arguing mainly that genuine issues of fact remained to be resolved. Minority Associates joined the City's opposition and asked for a continuance so that discovery could be completed before the Contractors' motion was ruled on.
 
 
 4
 On April 5, 1990, the district court granted Contractors' cross-motion, denied the City's motion, declared the minority-, female- and handicapped-owned business enterprise set-aside programs set forth in the Ordinance and the implementing regulations unconstitutional and permanently enjoined the City from enforcing or implementing the Ordinance or the regulations. The City filed its notice of appeal on April 10, 1990, and Minority Associates filed its notice of appeal on April 12, 1990.[2]
 
 II.
 
 5
 The district court had subject matter jurisdiction over the section 1983 claim that the Ordinance violated Contractors' right to equal protection under 28 U.S.C.A. § 1331 (West Supp.1991) and 28 U.S.C.A. § 1343(a)(3) & (4) (West Supp.1991). We have appellate jurisdiction over the City's and Minority Associates' appeals from the district court's final order under 28 U.S.C.A. § 1291 (West Supp.1991).
 
 
 6
 Our review of the district court's order denying the City's motion for summary judgment on standing and its order granting Contractors' motion for summary judgment on the merits is plenary. See Country Floors, Inc. v. A Partnership Composed of Gepner & Ford, 930 F.2d 1056, 1060 (3d Cir.1991). We review the district court's refusal to postpone action on the Contractors' motion pending further discovery by Minority Associates for abuse of discretion. See Lunderstadt v. Colafella, 885 F.2d 66, 71-72 (3d Cir.1989). If information concerning the facts to be discovered is solely in the possession of the movant, however, "a motion for continuance of a motion for summary judgment for purposes of discovery should [then] ordinarily be granted almost as a matter of course." Ward v. United States, 471 F.2d 667, 670 (3d Cir.1973) (citations omitted). The Ward rationale would not seem to apply, however, when the party seeking discovery has the information it seeks in its own possession or can get it from a source other than the movant.
 
 III.
 
 7
 The Ordinance in question is entitled "Goals For The Participation Of Minority, Female And Handicapped Owned Businesses In City Contracts." II Appendix (App.) at 310. Through various means, the Ordinance seeks to increase the number of "Disadvantaged Business Enterprises" owned by minorities, women or handicapped persons who are awarded city contracts. A Disadvantaged Business Enterprise is any small business "which is at least 51 percent (51%) owned by one or more socially and economically disadvantaged individuals."[3] Id. at 311. The Ordinance creates an agency called the Minority Business Enterprise Council (the agency). The agency is charged with the administration of the Ordinance, which authorizes the agency to presume that all minorities, women and handicapped persons are socially and economically disadvantaged persons. Once a Disadvantaged Business Enterprise receives contract work of more than $5,000,000.00 from the City under the Ordinance, that business is rebuttably presumed not to be disadvantaged. The Ordinance sets "goals" of fifteen-percent participation in city contracts for minority-owned businesses, ten percent for female-owned businesses and two percent for handicapped-owned businesses. Finally, the Ordinance contains provisions that allow the agency to waive its set-aside requirements in certain situations.
 
 A.
 
 8
 We first address the City's standing claim because it goes to the subject matter jurisdiction of the district court. See Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc., --- U.S. ----, 111 S.Ct. 2298, 2306 & n. 13, 115 L.Ed.2d 236 (1991) (Court first addressed standing and ripeness claims that could impair the Court's power to hear the case). The City contends that the Contractors lack standing for two reasons. First, the City says the Contractors did not establish that they suffered an injury-in-fact. Second, the City maintains that the Contractors cannot claim organizational standing because of conflicts of interest among the members of the organizations. We reject both challenges.
 
 
 9
 The Supreme Court of the United States has stated:
 
 
 10
 The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party.... A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action...."
 
 
 11
 Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). An association can have standing on the basis of direct injury against itself as an association. See Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). Under certain circumstances, an association can also have standing on the basis of injury to its members.
 
 
 12
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 13
 Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). The district court determined that Contractors met Hunt's requirements. Contractors Ass'n, 735 F.Supp. at 1281-87. We agree with its analysis.[4]
 
 
 14
 The City's second argument on standing merits more discussion. Because an association represents many individuals, the potential for conflict of interest exists among its members. The City notes that some of the Contractors' members qualify as disadvantaged businesses and actually oppose the litigation, and thus a conflict of interest exists that denies Contractors standing.
 
 
 15
 In considering whether a target corporation had standing to assert the interests of its shareholders in the case of a hostile takeover, we stated that "associational standing has never been granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members." Polaroid Corp. v. Disney, 862 F.2d 987, 999 (3d Cir.1988). We explained the rationale for denying standing to the corporation in that case as follows:
 
 
 16
 [A] potential conflict [exists] between those shareholders who view litigation to enjoin a tender offer as adversely affecting their opportunity to collect on the tender offer premium and those shareholders who are cut out of the tender offer and thus may want to see it defeated. Even though some shareholders are disadvantaged by their exclusion from the tender offer, a great majority of shareholders will often benefit from the offer. A corporation is thus an uncertain representative for the interests of the disadvantaged shareholders, as it may have an eye to protecting the interests of the majority. This undermines the basis for jus tertii standing--that the jus tertii advocate will vigorously assert the interests of the right-holder. See Craig v. Boren, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976); Singleton v. Wulff, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (plurality opinion). Indeed, one basis for the constitutional requirement that a litigant have a personal stake in a litigation is "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." Simon v. Eastern Kentucky Welfare Right [sic] Organization, 426 U.S. 26, 38 n. 16, 96 S.Ct. 1917, 1924 n. 16, 48 L.Ed.2d 450 (1976) (quoting Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).
 
 
 17
 Id. (emphasis in original).
 
 
 18
 In Polaroid, we noted two possible conflicts that could prevent a target corporation from seeking standing on behalf of its shareholders. The first is between management, who would seek to defeat the takeover to remain in control, and the shareholders, who could profit from the tender offer. The second conflict is between the shareholders who will profit from the tender offer, normally the majority of shareholders, and the target corporation when the target corporation sides with the shareholders who will not profit from the tender offer, normally the minority of shareholders. The conflict in our case is of the second type. In the matter at hand, however, the City and Minority Associates do not argue that Contractors are not representing the interests of a majority of their membership. Only twenty-nine of Contractors' 535 members are registered Minority, Female or Handicapped Business Enterprises. Contractors Ass'n, 735 F.Supp. at 1286. There is little chance that the conflict between the majority and minority of the Contractors' members will affect the adequacy of representation or present a likelihood of a collusive suit that would deprive the court of vigorous advocacy on all sides of this dispute. When an association has not violated its members' rights by ignoring the association's by-laws before bringing an action on a matter of concern to the membership, it is primarily concern over the absence of strong advocacy on both sides of a controversy that has motivated courts to hold that a conflict of interest among its members deprives an association of associational standing. See National Collegiate Athletic Ass'n v. Califano, 622 F.2d 1382, 1391-92 (10th Cir.1980) (an association cannot have associational standing if more members oppose the association's position than support it); Associated Gen. Contractors of Conn., Inc. v. City of New Haven, 130 F.R.D. 4, 10 (D.Conn.1990) ("[a]s long as the [law] suit is not in contravention of [the association's] purposes nor its by-laws ... it has [associational] standing"); Mountain States Legal Found. v. Dole, 655 F.Supp. 1424, 1426 (D.Utah 1987) ("Because associations typically consist of many members with potentially conflicting interests and views on any particular dispute, a danger exists that certain members of the association will be sympathetic to the adverse party. In such a case, there could be no legitimate controversy.").[5] The Contractors' position in this litigation is not contrary to the interests of a majority of their members, and there is nothing on this record indicating that they failed to follow their own internal rules before joining this litigation. Therefore, the City's argument fails, and we hold that Contractors[6] have associational standing to maintain the present action.
 
 B.
 
 19
 On the merits, Minority Associates contends that the district court erred in granting summary judgment to the Contractors since Minority Associates did not have enough time to discover evidence it believed was in the possession of the Contractors which would show the existence of past and present discrimination by Contractors against entities that would qualify as Disadvantaged Business Enterprises and so preclude the entry of summary judgment for Contractors under the teaching of City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Accordingly, it argues that the district court should have delayed ruling on the Contractors' motion for summary judgment until it and the City completed discovery. Minority Associates formally advised the district court of its need for further discovery in accord with Federal Rule of Civil Procedure 56(f). Rule 56(f) states:
 
 
 20
 Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.
 
 
 21
 Fed.R.Civ.P. 56(f). Whether such a motion should be granted depends, in part, on "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Lunderstadt, 885 F.2d at 71 (quoting Dowling v. City of Phila., 855 F.2d 136, 140 (3d Cir.1988)).
 
 
 22
 In order to examine the first consideration specified in Lunderstadt, what information is sought, we must look to the affidavit filed with the Rule 56(f) motion. It seeks information from Contractors concerning "past and current practices and/or instances of discrimination by plaintiffs and their members in both the public and private construction industries." II App. at 305. The affidavit also states that Minority Associates plans to seek this information from Contractors through testimony on depositions, interrogatories, and requests for production of documents served on Contractors.
 
 
 23
 Knowing what information Minority Associates seeks, we turn to the next part of Lunderstadt 's inquiry--whether the information sought, if uncovered, could preclude summary judgment. See Lunderstadt, 885 F.2d at 71. This inquiry into the substantive law on the constitutionality of minority set-asides is controlled by the Supreme Court's decision in Croson. From the opinions in that case, we must determine whether the information Minority Associates seeks could create a genuine dispute of material fact and so defeat Contractors' motion for summary judgment.
 
 
 24
 In Croson, a majority of the Supreme Court held that the City of Richmond had not demonstrated a compelling governmental interest that would justify its racially-based set-aside ordinance. Croson, 109 S.Ct. at 723-28. A plurality of the Court also held that the set-aside program violated the Equal Protection Clause of the Fourteenth Amendment because the City of Richmond had not demonstrated that the ordinance was necessary to remedy past discrimination. Id. at 730 (plurality opinion). The lack of record evidence concerning past "discrimination in the local construction industry" was fatal to the ordinance. Id. at 726; see id. at 723 & 727. The plurality says that this evidence is necessary to the constitutionality of a minority set-aside ordinance. See id. at 729-30 (plurality opinion). We conclude that the evidence of past discrimination Minority Associates seeks could preclude summary judgment if the City Council's purpose in creating the various set-asides was to remedy such discrimination.
 
 
 25
 Application of the last Lunderstadt factor requires an inquiry into why the party seeking more time has not previously obtained the information. In its Rule 56(f) affidavit, Minority Associates stated that Contractors had not yet answered many of the City's interrogatories seeking information Minority Associates needs to formulate its own interrogatories and depositions. Minority Associates also noted that the City's depositions of some of Contractors' members, in which Minority Associates would participate, had been noticed but not taken when the district court granted Contractors' motion for summary judgment. Minority Associates attributes this delay to the Contractors' desire for a protective order and its intent to move for such an order. These reasons are sufficient to explain why the information has not been previously obtained.
 
 
 26
 Since Minority Associates' request for more time to engage in discovery was for the purpose of seeking information that could defeat a summary judgment motion, which it could not have previously obtained, under Lunderstadt, its Rule 56(f) affidavit authorized the district court to delay action on the Contractors' motion for a reasonable time.
 
 
 27
 This conclusion does not, however, end our inquiry. A district court has discretion in acting on Rule 56(f) motions. See Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir.1986). The Lunderstadt factors simply offer a guide for a district court to follow in exercising its discretion under Rule 56(f).
 
 
 28
 In this case, however, the breadth of the district court's discretion is affected by Contractors' possession of records that contain the information Minority Associates seeks. As we said earlier, this limits the district court's discretion to deny a request for delay when a proper Rule 56(f) affidavit is filed. In such a case, a district court should grant a Rule 56(f) motion almost as a matter of course unless the information is otherwise available to the non-movant. See Ward, 471 F.2d at 670. Here, Minority Associates' Rule 56(f) affidavit avers the information it seeks from Contractors is not otherwise available. Thus, the record before us shows the Lunderstadt factors are present. See Lunderstadt, 885 F.2d at 71. It also demonstrates no undue delay. Cf. id.
 
 
 29
 Unanswered interrogatories and notices to take depositions directed to Contractors were outstanding when the district court ruled on Contractors' motion for summary judgment, a practice this Court has disapproved. See Sames v. Gable, 732 F.2d 49, 51 (3d Cir.1984). Accordingly, we conclude that the district court abused its discretion when it refused Minority Associates the delay it sought pursuant to Rule 56(f). On remand, Minority Associates should be given a reasonable opportunity to discover evidence that relates to a pattern of discriminatory practices or instances of discrimination in the Philadelphia-area construction industry that occurred over time before passage of the Ordinance.[7] We are confident that the district court will require the Contractors to move promptly for any protective orders they desire and thereafter impose reasonable limits on the scope and time for completion of the discovery Minority Associates seeks.
 
 IV.
 
 30
 The district court abused its discretion in not allowing a continuance before ruling on the pending motions for summary judgment. Consequently, our opinion takes no view on any of the other issues presented in this appeal with the exception that we agree with the district court's holding that the Contractors' have standing. Beyond that, we will vacate the order of the district court and remand for further proceedings consistent with this opinion. Each party to bear its own costs.
 
 
 31
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring in judgment.
 
 
 32
 I agree with the majority's conclusion and thoughtful opinion that the district court's order should be vacated, and that further discovery should be conducted. I write separately because in my opinion the majority makes a too premature decision to apply the strictures of City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), in a facial challenge to Chapter 17-500. As will be noted later, the factual matrix and the legislative standards in this case are, in many ways, remarkably different than those involved in Croson. While it is appropriate for the majority to inquire "into the substantive law on the constitutionality of minority set-asides" (Majority at 1266), I am not convinced that Croson is concentric with this case, and thus I write to make clear what I think are the significant differences.
 
 
 33
 In Croson, the Supreme Court set forth the strict scrutiny analysis applicable when a federal court is presented with a challenge to a race-based minority set-aside. Given the standard for summary judgment, I find problematic the fact that the majority might be implicitly assuming that strict scrutiny is applicable to Chapter 17-500. On its face, the ordinance does not assign government benefits according to an individual's race, nor does it require the City to do so. A general policy that permits but does not require unconstitutional conduct is not facially unconstitutional. See, e.g., Cone Corp. v. Florida Dept. of Trans., 921 F.2d 1190, 1209 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991). I submit that a careful review of the record in this case demonstrates that there are issues of material fact in dispute concerning whether the Croson analysis should be applied to Chapter 17-500.
 
 
 34
 For present purposes, strict scrutiny only applies when the government grants a benefit or imposes a burden because of the race of the plaintiff. The majority's semantic approach of placing the word "goals" in quotes and then changing the terminology to "set-aside requirements," see Majority at 1264, is not an adequate analysis of the terms of the challenged ordinance. With all due respect, I submit that the present record cannot by itself support the application of Croson 's strict scrutiny analysis to this case. In the words of Justice O'Connor, "[t]his dispute regarding the appropriate standard of review may strike some as a lawyer's quibble over words, but it is not. The standard of review establishes whether and when the Court and Constitution allow the Government to employ racial classifications." Metro Broadcasting, Inc. v. F.C.C., --- U.S. ----, 110 S.Ct. 2997, 3033, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting).
 
 
 35
 When presented with an equal protection challenge the first duty of the court is to determine what classifications have been created by the ordinance. Only after that issue is settled can the court determine the level of scrutiny appropriate to the classifications involved and proceed to the merits of the plaintiff's case. See Attorney General of New York v. Soto-Lopez, 476 U.S. 898, 906 n. 6, 106 S.Ct. 2317, 2470 n. 6, 90 L.Ed.2d 899 (1986); Memorial Hospital v. Maricopa County, 415 U.S. 250, 253, 94 S.Ct. 1076, 1079-80, 39 L.Ed.2d 306 (1974); San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). A court cannot merely assume that a suspect classification has been created. See San Antonio Independent School District, 411 U.S. at 19, 93 S.Ct. at 1289. This determination must be made in light of how the ordinance actually is implemented. In San Antonio Independent School District, both the majority and dissenters recognized that their task was "to ascertain whether, in fact, the ... system has been shown to discriminate ... and, if so, whether the resulting classification may be regarded as suspect." 411 U.S. at 20, 93 S.Ct. at 1289-90; Id. at 94, 93 S.Ct. at 1328 ("It is, of course, essential to equal protection analysis to have a firm grasp upon the nature of the discrimination at issue.") (Marshall, J., dissenting); see Long v. Saginaw, 911 F.2d 1192, 1198 n. 3 (6th Cir.1990); Cone Corp. v. Hillsborough County, 908 F.2d 908, 911 (11th Cir.), cert. denied --- U.S. ----, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990); Conlin v. Blanchard, 890 F.2d 811, 817 (6th Cir.1989); General Building Contractors Assn., Inc. v. Philadelphia, 762 F.Supp. 1195, 1205 (E.D.Pa.1991); cf. Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 653, 107 S.Ct. 1442, 1463, 94 L.Ed.2d 615 (1987) (O'Connor, J., concurring in judgment) (concerning Title VII). The appropriate test is "but for": But for the plaintiff's race, or gender, would he have been disadvantaged by the challenged statute? See, e.g., Los Angeles, Dept. of Water & Power v. Manhart, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978).
 
 
 36
 Of the two relevant provisions in the ordinance, the first adopts goals for City contracting. It was this section of the ordinance upon which the district court based its conclusion that Chapter 17-500 creates suspect classifications. On the summary judgment record, the district court concluded that these goals were being implemented as set-asides, and that therefore strict scrutiny was warranted. Although it is unclear, it is apparently this section of the Ordinance that the majority relies upon to justify its application of Croson to Chapter 17-500. However, because this provision merely sets goals and requires no action on the part of the City, this provision does not create any rights on the part of minority owned firms or any responsibilities owed those firms by the City. This provision, on its face, therefore, does not trigger strict scrutiny, in contrast to the Richmond Plan considered in Croson.
 
 
 37
 Of equal importance is the fact that when ruling upon a facial challenge to a statute, a court must consider any limiting construction a state or municipality has placed on a law, including any administrative interpretation and implementation of that law. See Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989); Hoffman Estates v. Flipside, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982); Hotel & Restaurant Employees & Bartenders Int'l Union v. Read, 832 F.2d 263, 268 (3d Cir.1987); Trade Waste Management Assoc. v. Hughey, 780 F.2d 221, 236 n. 6 (3d Cir.1985). As this court noted in Hohe v. Casey, 868 F.2d 69, 71 n. 2 (3d Cir.1989): "it is the procedures followed ... which are at issue, since 'the courts will not invalidate a statute on its face simply because it may be applied unconstitutionally, but only if it cannot be applied consistently with the Constitution.' " (quoting Robinson v. New Jersey, 806 F.2d 442, 446 (3d Cir.1986), cert. denied 481 U.S. 1070, 107 S.Ct. 2463, 95 L.Ed.2d 872 (1987)).
 
 
 38
 The cornerstone of the Contractors' argument is that the 15%, 10%, and 2% figures constitute the operative section because they allegedly set a rigid quota, or even floor, for the participation rate of the groups to which they apply. The Contractors conclude that because only minorities, women, and handicapped individuals are listed as qualifying for a percentage, this quota is race, sex, and handicapped based. However, as the parties made clear at oral argument, there is a material issue of fact in dispute over which section is the so-called "operative" section of the ordinance.
 
 
 39
 At oral argument before this court, the City contended that "the goals do not require participation at these levels, they are goals for measuring the success of the Affirmative Action Program. They don't require that there be fifteen percent minorities or ten percent female.... they are really goals for measuring the program." Transcript of Oral Argument 15-16. The City's argument is supported by testimony given at council hearings when the handicapped goals were being discussed. At issue was whether the five percent goal for contracts awarded to the handicapped would, in practice, be a goal or a quota. As the discussion reveals, the Procurement Office did not oppose the five percent goal in the ordinance because it would function as a goal, just as the percentages for Minority Business Enterprises ("MBEs") and Female Business Enterprises ("FBEs") did. Mr. Curtis Jones, from the Minority Business Enterprise Council, asked whether the handicapped provisions "fall under the same provisions within 17-500 which allow for a waiver process, which allow for us to adjust and amend on a contract-by-contract basis. Is that true?" He then described the system used for MBEs and FBEs: "If we have that system as a part of this goal, then we can make adjustments based on a fair review to see if there was a good-faith effort made by prime contractors to achieve the goals. So if we are talking about using the same mechanics that we do to administer for minorities and females...." The answer was yes.
 
 
 40
 Jones then responded "then I'm comfortable with what we call a goal. It's not a quota; it's a goal." IVB at 755-57 (emphasis added). The conclusion that the Disadvantaged Business Enterprise ("DBE") percentages were acting as goals and not quotas was also borne out by a statement of Councilperson Specter: "And we may not be able to reach that goal the first year, as we did not with minorities and women. But every year we come closer and closer to those goals." IVB at 750. In addition, there was specific evidence that the percentage used to gauge the participation of women does in fact work as a goal, not a quota: "Let's look at the female category for our program for example. We set a goal of ten percent for female entrepreneurs as an addition to the minority component. What we found was that that was very difficult to achieve. We've come in in about the neighborhood of a little better than eight percent overall." IVB at 760.
 
 
 41
 Under the standard for summary judgment, these colloquies create an inference that the City did not apply the ordinance inflexibly, and in fact distinguished the DBE goals from a quota system. This record creates a triable issue of fact over whether the percentages create a quota system or merely goals in Philadelphia. If the percentages do not fix any amount of the work to be allocated, then no right of the Contractors is infringed.
 
 
 42
 Indeed, in Croson, the issues of goals and flexibility were of paramount importance.
 
 
 43
 The Richmond Plan denied certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race. To whatever racial group these citizens belong, their "personal rights" ... are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decisionmaking.
 
 
 44
 488 U.S. at 493, 109 S.Ct. at 721 (emphasis added). The Court also noted that the Richmond Plan employed a "rigid racial quota," id. at 499, 109 S.Ct. at 724, and that the effect of the plan was to "apportion[ ] public contracting opportunities on the basis of race." Id. at 505, 109 S.Ct. at 727. The Court noted that in the public contracting milieu, "it is difficult to see the need for a rigid numerical quota." Id. at 508, 109 S.Ct. at 728 (emphasis added). In the present case, there is a material issue of disputed fact concerning whether a quota has been created, and a concomitant disputed issue over whether Croson is applicable.
 
 
 45
 I also note that even if the goals do parcel out contracts on the basis of disadvantage status, there is a material issue of disputed fact over whether the classification "disadvantaged status" triggers heightened scrutiny. There is a disputed issue of material fact over whether, under the definition of disadvantaged, "only minorities, women, and handicapped can ever be granted preferred status." I App. at 270. The City introduced an affidavit from the Executive Director of the MBEC that stated: "Any disadvantaged member of Plaintiff organizations ... who are disadvantaged are eligible for certification as a DBE without regard to their race, gender or physical capability. The MBEC considers economic and social factors in addition to race and gender in determining whether an applicant should be certified as a DBE." II App. at 286 (emphasis added). Giving the City the benefit of reasonable inferences, as we must on a motion for summary judgment, the record reveals that the intent of the council was to conduct an "investigation regarding the financial background of applicants to ensure that they are both socially disadvantaged and economically disadvantaged in terms of their history." IVB App. at 536-37. As discussed above, the City has introduced uncontroverted evidence, by affidavit, that this is actually how the chapter is administered. See also II App. at 364 (statement of Blackwell, not considered by the district court, that the ordinance was not intended to, and does not apply to, MBEs or FBEs that are not disadvantaged). The language of the ordinance supports this interpretation, and there is no evidence in the record to the contrary. In short, even assuming that the goals do in fact allocate city contracts, a conclusion this record does not dictate, if the City is correct in its assertion that the classifications merely distinguish individuals along economic and social lines, the ordinance should only be reviewed under the traditional rational basis test. See San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).
 
 
 46
 We are obligated to view the record in the light most favorable to the City. See Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1423 (3d Cir.1991) (in banc). The majority's implicit assumption that the Croson strict scrutiny analysis applies to the Ordinance constitutes a resolution of disputed facts that goes right to the heart of whether strict scrutiny is warranted in this case. See Ohio v. Akron Center for Reproductive Health, --- U.S. ----, 110 S.Ct. 2972, 2980-81, 111 L.Ed.2d 405 (1990); see also id. 110 S.Ct. at 2981 ("The Court of Appeals should not have invalidated the ... statute on a facial challenge based upon a worst-case analysis...."). The state of the record below should leave us uncertain of the applicability of Croson to Chapter 17-500. I would hold that summary judgment on the question of the standard applicable to the goals section of Chapter 17-500 was inappropriate based on the record below.
 
 
 47
 The second relevant section provides that if a city agency appears unable to meet the goals, "the MBEC may request that the agency furnish to it a compliance plan...." If the MBEC concludes that the compliance plan is insufficient, "the MBEC may recommend that the agency revise its plan.... Such recommended revisions may include" the sheltered market. (II App. at 317 (emphasis added).) This provision, the sheltered market provision, is the only section of the ordinance that, on its face, has the potential for parceling out city contracts on the basis of race, gender, or handicap status, and for therefore triggering heightened scrutiny. In order for the City to defeat a facial challenge to the Ordinance, it needs "merely to identify a possible" valid application of the challenged statute. Baltimore & Ohio R.R. Co. v. Oberly, 837 F.2d 108, 116 (3d Cir.1988). Chapter 17-500, however, can be applied in a manner that does not trigger heightened scrutiny, i.e., whenever the sheltered market is not used.
 
 
 48
 However, I do not believe that issue must be reached; under no set of circumstances is the City compelled to use the sheltered market. On its face, the ordinance contemplates many applications without resort to the use of a sheltered market, does not require the use of a sheltered market, and permits the use of the sheltered market only on a case by case basis. Obviously, the use of the sheltered market should be subject to heightened scrutiny, but because the ordinance permits the use of the sheltered market only on a case by case basis, such a challenge must come as an as applied, not a facial, challenge. The majority overlooks the dictates of United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), and Hoffman Estates v. Flipside, 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982), that a statute may only be invalidated on its face if it is incapable of any valid application. Thus, summary judgment in favor of the Contractors should not have been granted on this record.
 
 
 
 *
 At the time of argument, Judge Higginbotham was Chief Judge but has since assumed Senior status
 
 
 [1]
 The collective term "Contractors" means Contractors Association of Eastern Pennsylvania, Incorporated; General Building Contractors Association, Incorporated; Employing Bricklayers Association of Delaware Valley, Incorporated; and Subcontractors Association of Delaware Valley, Incorporated. These four are those plaintiffs the district court held met the standing requirements of Article III of the United States Constitution. See Contractors Ass'n of E. Pa., Inc. v. City of Phila., 735 F.Supp. at 1283-84 & n. 3
 
 
 [2]
 After oral argument, this Court received supplemental briefing from the parties in April and May of 1991
 
 
 [3]
 The class of "socially and economically disadvantaged individuals" is defined as follows:
 (11) Socially and Economically Disadvantaged Individuals shall mean those individuals who have either been subjected to racial, sexual or ethnic prejudice because of their identity as a member of a group or differential treatment because of their handicap without regard to their individual qualities, and whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged.
 (a) In determining who are socially and economically disadvantaged individuals, the Minority Business Enterprise Council may make a reputable presumption that all minority persons, all women and all handicapped persons shall be so classified.
 (b) The Minority Business Enterprise Council, in making said determination, shall also consider, among other things the extent of the liquid assets and net worth of such socially disadvantaged individuals.
 Id.
 
 
 [4]
 In Rocks v. City of Philadelphia, 868 F.2d 644, 648 (3d Cir.1989), this Court held that municipal taxpayers did not have standing to challenge Chapter 17-500 absent a showing that they had "sustained a proximate, individual and addressable injury, based solely on their status as municipal residents and taxpayers," but in dicta, stated that: "Contemplating the appellants' allegation, we think that an article III injury to contractors and bidders at large has been made out." This supports, but does not compel, our result
 
 
 [5]
 The United States Court of Appeals for the District of Columbia Circuit has rejected the theory that an internal conflict of interest may deprive an organization of standing. See Humane Society of the United States v. Hodel, 840 F.2d 45, 59-60 n. 25 (D.C.Cir.1988); National Maritime Union v. Commander, Military Sealift Command, 824 F.2d 1228, 1234 (D.C.Cir.1987)
 
 
 [6]
 The reader is reminded that the term "Contractors" as used in this opinion encompasses all the trade associations that joined in bringing this action who were found to have met Article III's requirements for standing by the district court. See supra note 1
 
 
 [7]
 Though Minority Associates may also compile and submit evidence of instances of discrimination that pre-date the passage of the Ordinance, we note that the questions of whether evidence of past discrimination not known to City Council when it passed the Ordinance is proof material to the legislative purpose of correcting such discrimination that Croson requires, or whether anecdotal evidence of discrimination is sufficient to show the compelling interest Croson requires are not now before us