DENNIS JACOBS, Circuit Judge,
dissenting:
I respectfully dissent.
This case was brought by two plaintiffs; one is an organization that seems not to exist except as a vehicle for this litigation; the other is an organization that claims standing by casting some of its own elective (and slight) conduct as injury, and by speculating about future harm that it is unlikely to incur. I would therefore order dismissal for lack of standing. Beyond that (if one can get beyond that), the injunction entered by the district court is more broad than the First Amendment violation found can justify, and is obviously formulated to remedy harms that were not found and were in any event not inflicted on these plaintiffs. The mess is unusually thick.
An Ordinance of the Town of Oyster Bay bars pedestrians from soliciting work from areas adjacent to a roadway and bars drivers from pulling over to pick them up. The complaint alleges that the Ordinance, which seems clearly aimed at conditions created by the recruitment of day laborers, violates rights of free speech, equal protection, and due process. The district court found that the bar on solicitation violates *119 the First Amendment and declined to reach other claimed grounds for relief. Unaccountably, however, the district court enjoined the enforcement of the entire Ordinance — including its regulation of drivers, which has no First Amendment ramification. The majority on appeal affirms the injunction in whole, and finds jurisdiction on the basis that one of the organizations had standing (without reaching the standing of the other). Because I would dismiss for lack of standing, I reach the standing question as to both plaintiff organizations.
I
According to the complaint, plaintiff Centro de la Comunidad Hispana de Locust Valley (“Centro”) is an “unincorporated membership organization.” That is a boast. It has no organization to speak of: no charter, no bylaws, no bank accounts, no funding, no expenditures. And it seems to have no members: anybody who shows up at a meeting (if there are any) is deemed a member; the only member identified in the record is one Luz Torres, who is the chairperson of whatever it is; and she conceded at deposition that “we don’t have membership.”
This supposed organization was formed (according to Torres) at a community meeting a few months after the Town of Oyster Bay adopted the challenged Ordinance. Although Torres says that Centro has some other generalized reasons to exist, she admits that the Ordinance was “the principal reason” it was formed. App. 529. That is easily demonstrated. There has been for twenty years an organization of similar name (Centro Cultural Hispano de Oyster Bay y Vecindades), of which Torres was a co-founder; Torres proposed that it sue the Town over the Ordinance; and only after at least some portion of the board disapproved did Torres think of creating a new organization.[1] A document memorializing a community meeting shortly before (new) Centro’s supposed formation includes bullet points of items discussed: the first bullet point is “Create an organization that is responsible and will support us”; and the third bullet point is “File the lawsuit.” (The second and fourth agenda items are “Be united to reach our goals” and “Attend Meetings.”)[2] Aside from Torres, attendees of the formational meeting are described in the record only generically, and prominently among them are “the lawyers.” App. 541. The record does not say what the lawyers were doing there, but they were evidently not helping Centro to incorporate, since it is unincorporated.
Everything supports the inference that Centro is a special-purpose litigation vehicle, created to bring this lawsuit. It is unclear whether it has done anything else in the seven years since it filed the complaint.[3] This pretext does not satisfy Article III, which requires that “the decision to seek [judicial] review ... be placed in the *120 hands of those who have a direct stake in the outcome,” and not' “in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests.” Diamond v. Charles, 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (internal citation and quotation marks omitted). Centro cannot suffer actual or threatened injury if it exists only as the vehicle for this litigation, or as the alter-ego of some concerned bystander.
XI
The second plaintiff, The Workplace Project, was apparently enlisted as a hedge against the court’s realization that Centro lacks standing. Workplace is a real organization that has existence and function outside this litigation. But it is not based in the Town of Oyster Bay; it is in the' Town of Hempstead, which is (of course) not subject to the challenged Ordinance. It claims nevertheless that .the scope of its mission encompasses all of Long Island, and it asserts standing on three grounds. Of the three, the district court premised standing solely on the idea that the Ordinance might be (erroneously) enforced against Workplace or its agents if its organizing and counseling activities are mistaken for roadside employment solicitation. The district court did not consider the other two other injuries claimed by Workplace as a pretext for standing: that the Ordinance harms its mission to serve day laborers by either dispersing them or reducing their number; and that its effort to fight the Ordinance diverts resources from its other activities. The majority is convinced that each of these threé purported injuries is real and independently sufficient to confer standing. But none of them constitutes “an ‘injury in fact’ — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or: imminent, not conjectural or hypothetical.” Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citation and quotation marks removed). .
The risk of mistaken enforcement against the organization’s advocates' is a fihe example of a conjectural and hypothetical harm — I suppose it could materialize, but it has not, and it might never. That is no “actual or imminent” injury.[4]
The supposed interference with the organizational mission of serving day laborers is conjectural, vague, and generalized. Worse, if it were sufficient, a pop-up organization could gin up standing by alleging a mission to oppose any law it wished to challenge. The majority is persuaded that by dispersing Oyster Bay’s day laborers, the Ordinance will make it harder for Workplace to meet with them; but .this would be an indirect and remote consequence, even assuming that Workplace operates in the Town of Oyster Bay. These arguments fail to establish “the irreducible constitutional minimum of standing.” Id.
The argument that the Ordinance injures Workplace by diverting its resources from other activities relies on a line of cases beginning with Havens Realty Corp. v. Coleman, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and culminating in Nnebe v. Daus, 644 F.3d 147 (2d Cir. 2011). The thrust of those cases (as to *121 organizational standing) is that even the slight diversion of resources to remedy some harm or to fight some harmful conduct or policy can constitute an injury-in-fact sufficient to confer standing if the injury is perceptible, concrete, and demonstrable. In those cases, however, the organizational plaintiff did not put itself in the way of harm as a pretext to achieve standing; rather, the challenged conduct or policy came unbidden to the organizational plaintiff, and diverted its limited resources. The distinction raises the problem of “manufactured” standing that is identified by the court in Nnebe. Synthetic standing was not found in that case; but it is present in this one, and the majority therefore distorts rather than applies those cases.
In Havens Realty, the organizational plaintiff provided housing counseling services to homeseekers of limited ■ means, and investigated complaints of discrimination. The’Supreme Court held that if the defendants’ alleged racial-steering practices “perceptibly impaired” the organization’s ability to provide its counseling and referral services, then “there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization’s activities — -with the consequent drain on the organization’s resources — constitutes far more than simply a setback to the organization’s abstract social interests.” 455 U.S. at 379, 102 S.Ct. 1114 (citation omitted).
In Nnebe, the organizational plaintiff was a taxi-drivers’ union; it had standing to challenge a license-suspension policy of the Taxi and Limousine Commission because it counseled those of its own members who were potentially affected, helped them obtain lawyers, and impressed upon the lawyers the heightened stakes that resulted from the policy. 644 F.3d at 157. We reasoned that the union needed to allocate resources to assist its members once the city initiated proceedings against them, and that need — which the union did not invite, choose, or provoke — created an injury sufficient for standing.
The organizational plaintiffs in those cases had their activities perceptibly impaired by the conduct or policy they challenged, and they diverted at least some of their limited resources to remedy the harm that the conduct or policy imposed. That is, the challenged conduct or policy arrived-at the organization’s door and either created new work for it or burdened the work it was already doing.
In this case, the only evidence that the Ordinance touched Workplace in any way is: the testimony of two people who worked for Workplace and who believe that some third employee visited day laborers in Oyster Bay at some time in the past, though they are vague about when and where and for ,what purpose, App. 937-38, 944-51; that some Workplace personnel attended a rally against the Ordinance, id. 947-48; and that Workplace “had to put some time into finding out about the ordinance” and tried “to support [Centro]” and “work on that issue to some degree,” id. 956.
None of that is a cognizable injury to Workplace. The crucial question is whether any of it required curtailing Workplace’s normal work; but as to that, the testimony was “I don’t remember.” Id. 957. The Ordinance may represent “a setback to [Workplace]’s abstract social interests,” Havens Realty, 455 U.S. at 379, 102 S.Ct. 1114, but mere organizational opposition does not constitute organizational injury. Even if Workplace invokes the “perceptible impairment” standard of Havens Realty and Nnebe, those eases do not relieve plaintiffs of the constitutional requirement of showing injury that is “concrete and particularized” and “actual or *122 imminent.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130.
In sum, the majority opinion premises standing on purported organizational injury that is speculative and generalized, and — to the extent that it exists — both elective and negligible. Workplace has not shown that the Ordinance inflicts unbidden injury on it as an organization, and it therefore does not have standing as an organization to bring this litigation.
Ill
This case, of course, is not about injury to any organization. To the contrary, the complaint affirmatively alleges that this is “a civil rights action about the ability of predominantly Latino, immigrant day laborers to exercise their right to solicit work on the streets and sidewalks of their towns and villages without fear of being targeted because of their race and national origin,” App. 115. In other circuits, an organization composed of members with standing (such as day laborers in Oyster Bay) can itself have standing in cases under the Civil Rights Act; but the precedent of this Circuit forecloses such representational standing. Since we (and apparently we alone) prevent representational standing, we require that in such cases the organization show injury to itself as an organization. The result has been an erosion over time of what constitutes institutional injury as we try to replicate representational standing by other means. This distortion explains what has happened in this case, in which “perceptible” impairment is treated merely as the opposite of “imperceptible,” and in which we dispense altogether with the constitutional requirement of injury that is both “concrete” and “demonstrable,” and either “actual” or “imminent.”
The rule in this Circuit — that an organization lacks standing to sue under the Civil Rights Act for violations of the rights of its members — was adopted over forty years ago in a case that may have outlived its usefulness. In Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973), this court reasoned that the statute “confers a cause of action on ‘any citizen of the United States or other person within the jurisdiction thereof who has been deprived under col- or of state law ‘of any rights, privileges, or immunities secured by the Constitution and laws,’” and that “[njeither this language nor the history” of the statute suggests that organizations can sue in the place of others. Id. at 1099. The court cited Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), in which the Supreme Court dismissed organizational plaintiffs (while affirming a holding in favor of individual plaintiffs) on the ground that the Privileges and Immunities Clause, 307 U.S. at 514, 59 S.Ct. 954, and the liberty guarantee of the Due Process Clause, id. at 527, 59 S.Ct. 954, apply only to “natural, not artificial, persons.” Id.
Hague thus suggests that organizations cannot sue on their own behalf (because they lack the rights they would seek to vindicate);[5] but it says nothing about whether they can stand in the place of their members. And two years after Aguayo, the Supreme Court observed (albeit in dicta) that “[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members” if its members are harmed. Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The *123 Supreme Court later cited Warth when it formulated a three-part test for this “representational” or “associational” standing:
an association has standing to bring suit on behalf of its members when: (a) its members would otherwise hqve standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization’s purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.
Hunt v. Washington Apple Advertising Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
Did Warth and Hunt abrogate Aguayol Hunt was not a § 1983 case, though it relied on Warth, which was; and the relevant portion of Warth is dicta. Nevertheless, several of our sister circuits, unburdened by Aguayo, have applied the Hunt test for representational standing in § 1983 cases. See, e.g., Nat’l Fed’n of Blind of Mo. v. Cross, 184 F.3d 973, 981 (8th Cir. 1999); Retired Chi. Police Ass’n v. City of Chicago, 7 F.3d 584, 600-07 (7th Cir. 1993); Contractors Ass’n of E. Pa., Inc. v. City of Philadelphia, 945 F.2d 1260, 1264-66 (3d Cir. 1991); Md. Highways Contractors Ass’n, Inc. v. State of Maryland, 933 F.2d 1246, 1251-53 (4th Cir. 1991); Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1405-09 (9th Cir. 1991). The Fifth and Sixth Circuits have expressly held that organizations possess standing to sue under § 1983 for violations of the rights of their members in such circumstances. See Church of Scientology v. Cazares, 638 F.2d 1272, 1276-77 (5th Cir. 1981); Memphis Am. Fed’n of Teachers v. Board of Educ., 534 F.2d 699 (6th Cir. 1976).[6]
This Circuit has adhered to Aguayo without ever expressly considering the impact of Warth or Hunt. See League of Women Voters v. Nassau County Board of Supervisors, 737 F.2d 155, 160-61 (2d Cir. 1984) (“This Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured.... Necessarily, we adhere to our prior decisions .... ”). Nnebe likewise followed Aguayo (this time over the objection that it had been cast into doubt by Warth), observing in a footnote that
we reaffirmed the Aguayo rule in League of Women Voters nine years after Warth and have not since reconsidered it. Accordingly, we are bound by the implicit determination of prior panels that the rule survives Warth ‘until such time as [our prior decisions] are overruled either by an en banc panel of our Court or by the Supreme Court.’
644 F.3d at 156 n.5 (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)) (emphasis
We continue to rely on that “implicit determination.” Nnebe posits that we await Second Circuit in banc review to overrule Aguayo (or, presumably, even to consider for the first time explicitly whether its rule is abrogated by Warth and Hunt). But that may be a vain hope given the desuetude of our in banc practice. In the meantime, our indulgence of increasingly tenuous and pretextual claims of injury to organizations themselves now threatens to swallow Article III limitations: the majority opinion holds, in essence, that an organization can achieve standing to challenge a law relevant to its mission by “allocating resources” to learn *124 ing about the law and attending a protest rally.
The plaintiffs preserve by footnote the argument that they have representational standing, noting that “Aguayo is contradicted by subsequent Supreme Court authority ... and is inconsistent with the principles underlying § 1983.” Appellee Br. 51 n.16, They may be right about Aguayo, and a time may come when we rethink organizational standing, or when the Supreme Court does an intervention.
IV
Since on this record no plaintiff has shown standing, I would go no further. The majority does go further, however; and while there is appreciable merit to its analysis, it affirms a remedy considerably broader than that analysis can support.
The consistent focus of the majority opinion is the First Amendment rights of people’ soliciting work while standing at the roadside. The speakers whose rights are at issue are the people who are saying (as the majority puts it), “hire me,” Op. Ill, and the restriction on that commercial speech is the premise for all that follows (right up to the examples of a lemonade stand, and the veteran who will work for food), Op. 114-15. This, it seems to me, is sound as far as it goes. Even the “conduct component” of attempting to stop vehicles is essentially expressive since alia pedestrian can do from the, lawful vantage of a sidewalk is signal availability to passing drivers. The persuasive force of this analysis has bearing on subdivision C of the Ordinance, which restricts the conduct of persons adjacent to the roadside. It does not, however, support an injunction against enforcement of the Ordinance as a whole, which in subdivision D regulates traffic, and in particular the conduct of the truck-drivers, who are not engaged in speech.
“[T]he normal rule [is] that partial, rather than facial, invalidation is the required course,” Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 504, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), and we therefore “should refrain from invalidating an entire statute when only portions of it are objectionable.” Nat'l Advert. Co. v. Town of Niagara, 942 F.2d 145, 148 (2d Cir. 1991). Severance is a question of state, law, and New York follows- the standard described by Justice Cardozo:
The principle, of division is not a principle of form. It is a principle of function. The question is in every case whether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid- to the branch, instead of at the roots.
People ex rel. Alpha Portland Cement Co. v. Knapp, 230 N.Y. 48, 60, 129 N.E. 202 (1920). The Ordinance contains separate commands, separately lettered, and the separate command' of subdivision D can operate independently. It can hardly be doubted that the Town would wish to enforce this traffic rule: as the majority opinion' recognizes, the Town’s asserted interest is substantial, Op. 113, and the Ordinance directly advances that interest, Op. 114.
■ According to the Town, the goal of the Ordinance is to fix the traffic and safety problems that arise when trucks stop along a roadway, to pick up day laborers. This problem is addressed directly by subdivision D, which applies to drivers only. And since driving is not speech, subdivision D does not burden speech — and it *125 raises no thorny problems (arguably raised by subdivision C) such as the uncertain scope of proscribed conduct or discriminatory enforcement. This is fully consistent with the majority’s analysis; the conclusion that the Ordinance is overbroad would be strengthened by the observation that the Town can advance its important governmental purpose just as well without the offending subsection C.
True, the parties have not argued or briefed severability, but severance is' unlike ordinary defenses, which are abandoned unless raised; a severance issue arises only when a court finds a statutory infirmity and must craft a remedy, and the issue inheres in the judicial act of ordering a remedy. Sua sponte invocation of this prudential rule may be a case-by-case decision, but when a plaintiff seeks an injunction more broad than necessary to remedy the wrong that is found, it is prudent to tailor the injunction (or revisit it) even if the defendant imprudently made all-or-nothing arguments.
Waiver is a prudential doctrine, and its invocation here would conflict with the “general rule [that] a court should refrain from invalidating an entire statute when only portions of it are objectionable.” Nat’l Advert. Co., 942 F.2d at 148. “Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert.” Alpha Portland Cement Co., 230 N.Y. at 62-63, 129 N.E. 202. The Supreme Court has instructed that, ordinarily, “partial, rather than facial, invalidation is the required course.” Brockett, 472 U.S. at 504, 105 S.Ct. 2794 (emphasis added). The ap-pellees’ brief in Brockett argued that the appellants should be precluded from raising severability because they failed to raise it below (Brockett, Appellees Br. at 44 (1984 WL 565782)); yet Brockett did not consider waiver, and held that “severability is no obstaclé to partial invalidation, which is the course the Court of Appeals should have pursued.” 472 U.S. at 507, 105 S.Ct. 2794 (emphasis added).[7]
If some plaintiff had standing, and if the majority were correct at every other point in its opinion, the proper remedy would be severance and an injunction limited to subdivision C of the Ordinance. Of course, the overbreadth of the injunction here is no drafting error. The transparent purpose of seeking an injunction to protect the expressive rights of day laborers is to enable the open-air traffic in day labor; and the complaint seeks to vindicate the Equal Protection and Due Process rights of those day laborers against what the plaintiffs allege is the discriminatory motive of the Town. The enjoining of subsection C— which is the appropriate remedy for the First Amendment infirmity found — would be an insufficient means to those broader ends. However, the district court did not rule bn the Equal Protection or Due Process claims, and the majority now affirms an injunction suited to claims that were never reached.

. It is unclear whether the board formally declined to sue the Town or if Torres voluntarily withdrew the proposal after encountering opposition. Reasons for declining are not stated in the record, though they might be inferred from the fact that the organization has a long-standing (and apparently ongoing) relationship with the Town, which grants it free use of facilities and provides funds for its English classes and youth programs.

. This document and the portion of the deposition transcript that includes the admission that Centro has no membership are filed under seal as part of a "Confidential Appendix.” The reason for confidentiality is obscure, and suppression is contrary to the public interest. Confidentiality was not required to preserve the privacy of members, who are not listed if indeed they exist.

.A Google search for “Centro de la Comuni-dad Hispana de Locust Valley” returns about 250 results, all of which pertain to this litigation.

. To show imminence, the majority cites Davis v. F.E.C., 554 U.S. 724, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008), which “held that a political candidate faced injury sufficiently imminent to challenge campaign disclosure requirements by simply declaring his intention to run for office and to spend more than the amount for which disclosure was required.” Op. 111. The candidate in Davis thus challenged a law that would apply to him, whereas here, a law that does not apply to the plaintiff is challenged because the plaintiff thinks it might be enforced against it by mistake.

. The Supreme Court has lately taken a more expansive view of the rights of artificial persons. See, e.g., Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014); Citizens United v. FEC, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

. Additionally, one district court in this circuit held (in a decision that was evidently never appealed) that “[t]he premises upon which the Aguayo decision was based ... are no longer viable in light of” Warth and Hunt. Huertas v. E. River Hous. Corp., 81 F.R.D. 641, 651 (S.D.N.Y. 1979) (Carter, J.).

. The Supreme Court’s'decision in Legal Services Corp. v. Velazquez, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), is not to the contrary. In that case, the Second Circuit had invalidated only a portion of a statute, and because the parties did not discuss the severability determination at the Supreme Court, that Court ‘‘in the exercise- of [its] discretion and prudential judgment ... decline[d] to address it.” id. at 549, 121 S.Ct. 1043. There is a difference, however, between an exercise of discretion and prudence that leaves in place part of a law, and one that invalidates more ■. of a law than necessary.