OPINION OF THE COURT
LOUIS H. POLLAK, District Judge.
This case, brought under 42 U.S.C. § 1983, arises out of the dismissal by Rutgers University — New Jersey’s principal state institution of higher education — of plaintiff Dr. Joseph San Filippo, who was, until May 13, 1988, a tenured professor of chemistry. The defendants named in this case are Rutgers University and six members of the Rutgers Board of Governors (hereinafter collectively described as “Rutgers”). The district court granted Rutgers’ motion for summary judgment and dismissed Professor San Filippo’s case.
On appeal, San Filippo, with support from the Rutgers Council of American Association of University Professors Chapters (“Rutgers AAUP”) as amicus, challenges the district court’s grant of summary judgment in Rutgers’ favor: (1) on San Filippo’s claim that he was dismissed in retaliation for the exercise of his first amendment rights, and (2) on San Filippo’s claim that Rutgers violated his right to procedural due process, because the panel that recommended his dismissal had, according to San Filippo, a financial incentive to recommend dismissal.
Part I of this opinion outlines the factual background and procedural history of this ease. Part II analyzes the legal issues posed by San Filippo’s first amendment claim. Part III addresses San Filippo’s due process claim.
I. Factual background and procedural history
Because San Filippo appeals from the district court’s grant of Rutgers’ motion for summary judgment, the following factual recital accepts as true all evidence proffered by non-movant San Filippo, with all reasonable inferences drawn in his favor.
On November 25, 1985, Dean Tilden Edel-stein told San Filippo and his Rutgers AAUP counsellor, Wells Keddie,[1] of allegations that San Filippo had harassed, exploited and attempted to exploit visiting scholars from the People’s Republic of China. On January 6, 1986, Dean Edelstein sent San Filippo a letter stating the complaints against him. As required by one of the University’s dismissal regulations, advice about whether dismissal proceedings should be commenced was sought from two groups of San Filippo’s faculty peers and three academic officers of the University. On February 14, 1986, the tenured faculty members of the chemistry department passed a resolution concluding that the charges against San Filippo, if proven, represented grounds for dismissal. After the Appointments and Promotion Committee, the University Provost, and the Chief Academic Officer concurred in the sentiment expressed in that resolution, Rutgers University President Edward Bloustein wrote a letter to San Filippo, dated October 1, 1986, in which he described the formal charges against San Filippo. President Bloustein farther indicated that, if San Filippo did not make a timely request for a hearing, President Bloustein would recommend to the University’s Board of Governors that San Filippo be dismissed based on the charges outlined in the letter.
San Filippo exercised his right to a hearing before a panel of five faculty peers (the *427 “Senate Panel”) which, after a forty-six day hearing, concluded that San Filippo had committed almost all of the offenses charged. In a forty-four page report, issued on December 21,1987, the Senate Panel recommended that San Filippo be stripped of his tenure and dismissed from the University. The Board of Governors unanimously concluded in its sixty-page opinion that the Senate Panel’s findings were supported by the evidence. On May 13, 1988, the Board of Governors voted to dismiss San Filippo on the basis of nine charges of misconduct. One member of the seven-member Board — -Walter Wech-sler — voted against dismissal because he believed that the sanction was too severe; Wechsler has not been named as a defendant.
San Filippo filed the instant action on June 13, 1988. He alleges, among other things, that disciplinary proceedings were initiated against him and that he was dismissed in retaliation for the numerous (1) grievances and lawsuits he had instituted, and (2) complaints he had voiced, against Rutgers University and various University officials between 1977 and 1986 — activities that he contends are protected by the first amendment.
A. San Filippo’s alleged protected activities
In 1977, San Filippo wrote a letter to the then chemistry department chairman, Professor Sidney Toby, complaining about dangerous conditions in the chemistry laboratories, conditions that had been described by the New Jersey Department of Health as “generally unsatisfactory.” In 1979, in response to a newspaper reporter’s questions concerning a student’s collapse due to noxious fumes during a chemistry experiment, San Filippo stated — as reported by the newspaper on January 30, 1979 — that undergraduate students were being subjected to a “health hazard and an absolute danger” and that “minimum safety requirements are not being met.” San Filippo was berated by the then department chairman, Professor Joseph Potenza, and by an administrator for making these comments. San Filippo’s comments led to the creation of an American Association of University Professors — University Safety Committee.
In 1977 and 1978, San Filippo testified before a grand jury regarding an investigation into the manufacture of illegal drugs in the chemistry laboratories. Potenza criticized San Filippo for his “disloyalty” and for “washing the department’s dirty linen in public.”
In 1983-84, San Filippo became embroiled in a dispute over what he describes as an effort by members of the chemistry department’s instruments committee to obtain federal funding for a mass spectrometer by misrepresenting the department’s need for such an instrument. San Filippo threatened to tell the federal funding agency the truth about the department’s needs. The committee members wrote a memorandum to Poten-za, as department chairman, protesting San Filippo’s threats to undermine their efforts to obtain a mass spectrometer. Potenza told San Filippo that he intended to place the memorandum in San Filippo’s personnel file. San Filippo contacted the United States Attorney’s office regarding this action against him, and an Assistant United States Attorney told San Filippo that such an action would be characterized as an effort to obstruct justice. After San Filippo told Poten-za what the government lawyer had said, Potenza had the letter of reprimand removed from San Filippo’s personnel file.
Between 1979 and 1986, San Filippo complained about certain financial irregularities in the chemistry department, particularly efforts to divert funds from San Filippo’s federal grants. In October 1985, San Filippo objected to a proposal by the new department chairman, Professor Robert Boikess, to impose a “shop-user’s fee,” which San Filippo characterized as illegal double billing of chemistry department members.
In 1981, the chemistry department declined to recommend San Filippo for promotion to full professorship. San Filippo filed a grievance in 1982, contending that he had been denied promotion through manipulation of his promotion packet. While this grievance was pending, the chemistry department recommended that San Filippo be promoted to full professor, effective July 1984. Although the grievance committee ultimately agreed with San Filippo that he should have *428 been promoted, the University took the position that the issue was moot. In September 1985, San Filippo filed a lawsuit in state court in which he contended that he was entitled to have his promotion effective July 1982. That suit is still pending.
In 1984, San Filippo grieved the fact that he had been denied a merit salary increase. The University rejected San Filippo’s grievance, and he filed for non-binding arbitration. The first hearings in the arbitration occurred in October 1985. On September 10, 1986, Boikess testified for the University. Regarding this event, the arbitrator commented in his decision dated December 26, 1986:
Little things are often very revealing. A transcript does not convey the full flavor of what transpires in the hearing room. Boikess was called on the last day of the hearing. He brought his own lawyer with him (Mr. Peirano).
San Filippo cordially greeted him before he took the stand. Boikess would not acknowledge the greeting and refused to acknowledge grievant’s presence in the room.
During his testimony, Boikess kept referring to grievant’s “self-nomination” [for the merit salary award]. His tone of voice was so caustic that it sparked an inquiry from me. (The inference to be drawn by the tone of voice employed was that a “self-nomination” was somehow less worthy).
I specifically asked Boikess why he emphasized “self-nomination.” Boikess danced around the issue and did not really answer my question. It became obvious that he would not answer, so I gave up. Further, the tenor and tone of his testimony revealed his near-total contempt for San Filippo.
I note in passing that most of the persons being considered were self-nominated. The [merit salary award procedure] specifically provides for same.
One would have to be a block of wood to fail to notice Dr. Boikess’ complete distaste for Joe San Filippo.
(A.1155 n. 21). The arbitrator sustained San Filippo’s complaint. He further noted in his opinion:
San Filippo testified, without contradiction, that he was criticized by administration officials for talking to the school newspaper about unsafe conditions in the laboratories. [San Filippo] was chairman of the Safety Committee at the time. A student took ill. [San Filippo] was accused of being “disloyal.” Putting aside the serious first amendment issues the episode raises (Pickering v. Board of Education, 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811]), it seems to me that the danger to the health of the students outweighs any possible harm to the reputation of those in authority that disclosure of lab conditions might have created. Further, there is a difference to [sic] loyalty to the institution and the purposes it is supposed to serve and fealty to the individuals who may, at any given moment, occupy positions of higher authority in the organization. Which is more important in the scheme of things: bruised feelings because the teacher is tough and demanding or personal safety?
While not directly at issue, there was some unsettling evidence that [Dr. San Filippo’s] promotion packet had been surreptitiously removed and unfavorable material secretly inserted. [Dr. San Filippo] had to bring successful grievance action to rectify the situation. It would appear that someone was willing to go to extraordinary lengths to deny [Dr. San Filippo] professional advantage. That kind of conduct is similar to what happened to [Dr. San Filippo] in the [merit salary award] review.
[Dr. San Filippo’s] nomination was clearly judged under separate “San Filippo rules” that were applicable to no one else.
- I know a pipe job when I see one.
(A.1161 n. 29).
In November 1985, Dr. San Filippo brought a libel action in state court against three administrators who accused San Filip-po of deliberately falsifying time reports relating to one of his technical assistants.
Finally, San Filippo brought a lawsuit in state court against the University in March 1986 complaining about, among other things, the University’s decision to prohibit — without *429 a hearing of any kind — graduate student assistance in San Filippo’s research program, because of the accusations against San Filip-po.
B. The charges and proceedings against San Filippo
As explained above, on October 1, 1986, President Bloustein brought formal written charges against San Filippo. After a hearing before the Senate Panel, which recommended dismissal, the Board of Governors, which reviewed the findings of the Senate Panel for sufficiency of the evidence, concurred in the Senate Panel’s findings sustaining the following charges:
Charge 1: Your treatment of scholars visiting from the People’s Republic of China and a Chinese Teaching Assistant violated the standards of professional ethics required by all faculty members. More specifically, your treatment with respect to these individuals, as set forth more fully in the attached documents, is as follows: a. You took advantage of your professorial position and exploited Mr. Hetian Gao and Mr. Changhe Xiao, both visiting scholars from the People’s Republic of China, by directing them or leading them to believe that they had no choice but to perform domestic work for you, such as garden work and indoor and outdoor cleaning work during the period May through July 1985.[2]
c. You exploited Messrs. Gao and Xiao by representing that they would be provided health benefits coverage and that you would deduct $700.00 from the salary to be paid each of them in order to cover the costs of such benefits. Despite deducting such sums, you did not provide coverage to either Mr. Gao or Mr. Xiao.
d. During the period of time that the above-named visiting Chinese scholars were at Rutgers, you threatened and harassed those individuals by repeatedly stating that you would send them back to China and by directing abusive language toward them.
e.On or about March 31,1986, you interrupted without sufficient cause a laboratory class being conducted by Teaching Assistant, Zong Ping Chen. You continued that incident by treating her in an unprofessional, threatening and abusive manner, within the hearing of other individuals, including her students.
Charge 2: On or about July 8, 1985, you directed Mr. Changhe Xiao, who had injured himself while doing maintenance work at your house, to identify himself as Mr. Peng Zhou in Middlesex Hospital in order to have Mr. Xiao covered by Mr. Peng Zhou’s medical insurance.
Charge S: You encouraged and permitted individuals working under your direction and supervision to submit false time reports and to make inappropriate charges against certain University accounts. Specifically: [3]
b. Ms. Marilyn Brownawell, who works directly under your supervision, submitted time reports for the week ending August 17, 1984. She reported and was paid for 40 hours of work for that period, charged against the Chemistry Department’s mass spectrometer account, even though you knew that she did not perform any work related to the mass spectrometer or indeed any compensable work for Rutgers of any kind during that period.[4] Charge J: You violated professional and academic standards and exploited foreign visitors to the University by bringing to the University as post-doctoral fellows Chinese scholars you knew did not have appropriate credentials and by charging stipends of such individuals, who did not possess doctoral degrees, to your NSF grant as post-doctoral fellows. Subsequently you supported these individuals for admission to the graduate program in Chemistry, a fact which clearly established that
*430 they did not have the credentials to be post-doctoral fellows.[5]
Charge 5: During Fall 1985, you submitted an application for admission to the graduate program, including letters of reference, on behalf of Mr. Peng Zhou, one of the individuals referred to in # 4 above. One of the letters of reference submitted by you purportedly was written and signed by Liu Guozhi. In fact, that letter was not prepared by Liu Guozhi, and you had knowledge of the fact and did not make it known when you submitted the letter. Charge 6: On December 16, 1985, Professor Robert Boikess, Chair of your department, specifically instructed you not to permit Mr. Peng Zhou, Mr. Cong-Yuan Guo, or any other graduate student except those already associated with your research group, to work in your laboratory, pending investigation of allegations of exploitation and harassment lodged against you by visiting Chinese scholars. Despite these specific instructions, you subsequently permitted Cong-Yuan Guo, Zhen-min He, and Peng Zhou to perform work in your laboratory.
In the Board’s opinion, the Board specifically found that the conduct described in sustained charges 1(a), 1(d) and 1(e) was a serious enough breach of the role of faculty member that, even if those were the only sustained charges, there would be sufficient cause for dismissal. Accordingly, on May 13,1988, the Board directed that San Filippo be dismissed from the University.
Board member Wechsler agreed with his colleagues’ findings but felt that dismissal was too severe a sanction: “Because this punishment is clearly out of proportion to his alleged wrongdoing, and quite possibly tainted by a long history of animus, I respectfully dissent.” (A.322).
C. The procedural history of this case
On June 13, 1988, San Filippo filed this suit against the University and the six Board members who voted in favor of his dismissal. San Filippo sued under § 1983 and state law, alleging that the dismissal violated his speech, petition, equal protection, and due process rights under the United States and New Jersey Constitutions, and violated his common law contract rights.
Following the parties’ cross-motions for summary judgment on a number of issues, the district court granted San Filippo’s motion for partial summary judgment on his claim that the regulations pursuant to which he was dismissed were void for vagueness. San Filippo v. Bongiovanni, 743 F.Supp. 327 (D.N.J.1990). The void-for-vagueness issue was certified for interlocutory appeal to this court; we reversed and remanded the case for further proceedings. San Filippo v. Bongiovanni, 961 F.2d 1125, 1139-40 (3d Cir.1992). After the Supreme Court denied San Filippo’s petition for certiorari, San Filippo v. Bongiovanni, — U.S. -, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992), the district court referred the remaining summary judgment motions to a magistrate judge.
In his Report and Recommendation, the magistrate judge recommended that summary judgment be granted in defendants’ favor on San Filippo’s procedural due process claim and on his state law claims, but that summary judgment be denied on San Filippo’s first amendment/equal protection claim.[6] Regarding the first amendment claim, the magistrate judge first explained that this circuit uses a three-part test to assess a public employee’s claim of retaliation for having engaged in a protected activity. First, plaintiff must show that he engaged in a protected activity. Second, plaintiff must show that the protected activity was a substantial factor motivating the dismissal decision. Finally, defendant may defeat plaintiffs claim by demonstrating that the same action would have taken place even in the absence of the protected conduct.[7] See *431 Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993); Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir.1983) (citing Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 283-87, 97 S.Ct. 568, 574-76, 50 L.Ed.2d 471 (1977)).
With respect to the first prong of this test, the magistrate judge concluded that, unlike speech generally — which is protected under the first amendment only if it addresses a matter of public concern — San Filippo’s lawsuits and grievances were activities protected under the petition clause of the first amendment regardless of whether they addressed matters of public concern. The magistrate judge then noted that a fact-finder could reasonably infer that San Filippo’s protected conduct was a substantial factor motivating the decision to dismiss him from the University. Finally, the magistrate judge recommended that San Filippo be given the chance to conduct additional discovery in order to rebut Rutgers’ claim that San Filippo would have been dismissed even in the absence of his protected activities, 'because the magistrate judge believed that the defendants had not yet made relevant discovery material available to San Filippo, the magistrate judge recommended that summary judgment be denied under Rule 56(f) of the Federal Rules of Civil Procedure.[8]
San Filippo did not object to the magistrate judge’s recommendation that Rutgers be granted summary judgment on the state law claims. Accordingly, in an opinion dated September 28,1993, the district court accepted those recommendations and granted Rutgers summary judgment on those claims. San Filippo objected to the magistrate judge’s recommendation that Rutgers be granted summary judgment on his due process claim, and argued that he was entitled to summary judgment on that claim or at least to further discovery. Rutgers objected to the magistrate judge’s recommendation that summary judgment on San Filippo’s first amendment claim be denied.
The district court adopted the magistrate judge’s recommendation that summary judgment be granted on San Filippo’s due process claim, but rejected the magistrate judge’s recommendation that summary judgment be denied on San Filippo’s first amendment claim. With respect to the first amendment claim, the district court first disagreed with the magistrate judge’s conclusion that San Filippo’s lawsuits and grievances were activities protected under the first amendment petition clause regardless of whether they addressed a matter of public concern. Instead, the district court held that lawsuits and grievances, like speech generally, are protected ■ activities under the first amendment only if they address matters of public concern.
The district court concluded that some of San Filippo’s speech addressed matters of public concern and was therefore protected under the first amendment. The district court also concluded that a fact-finder could reasonably infer that San Filippo’s protected conduct was a substantial factor motivating his dismissal. However, the district court held that there was no basis in the record from which a fact-finder could reasonably conclude that San Filippo was dismissed because of his protected conduct, rather than because of the misconduct described in the charges brought against him. Moreover, the district court rejected the magistrate judge’s recommendation that a ruling on the summary judgment motion be delayed until after San Filippo had had an opportunity to conduct additional discovery, and instead held that San Filippo had received all discovery to which he was entitled. Accordingly, the dis *432 trict court held that Rutgers was entitled to summary judgment on San Filippo’s first amendment claim as well as on his due process and state law claims, and dismissed San Filippo’s complaint in its entirety.
On appeal, San Filippo argues that the district court’s order granting Rutgers summary judgment on his first amendment claim should be vacated because the district court erred, (a) in granting Rutgers’ motion for summary judgment without affording him an opportunity to take additional discovery, and (b) on the merits. San Filippo also contends that the district court’s order granting Rutgers summary judgment on his due process claim should be vacated because there remains a material issue of fact regarding the question whether the Senate Panel had a pecuniary interest in the outcome of the proceedings against San Filippo, and because he was entitled to additional discovery.
II. San Filippo’s first amendment claim
San Filippo first contends that the district court erred in denying his request, made pursuant to Rule 56(f) of the Federal Rules of Civil Procedure,[9] that the district court delay its ruling on Rutgers’ summary judgment motion until after he had time to conduct further discovery. San Filippo made various discovery requests on September 7, 1989; Rutgers asked to have until November 7 to respond. On November 24, San Filippo wrote a 20-page letter to Rutgers pointing out inadequacies in Rutgers’ response. On November 29, Rutgers moved for summary judgment and the requested information was never supplied. San Filippo submitted a Rule 56(f) affidavit in support of its opposition to Rutgers’ motion for summary judgment. The magistrate judge recommended that the ruling on the summary judgment motion be deferred until after San Filippo had an opportunity to take additional discovery.
The district court rejected the magistrate judge’s conclusion that summary judgment should not be granted until San Filippo had an opportunity to discover additional information. The court explained that San Filip-po argued that “he must see the records of other faculty persons similarly situated (i.e., persons who have been known to commit, or were accused of committing, similar offenses, but against whom no sanctions, or not as severe a sanction was imposed).” Opinion at 42 (internal quotation omitted). The court rejected San Filippo’s argument for two reasons. First, the court concluded that “faculty members ‘similarly situated’ to plaintiff are those faculty members against whom formal charges have been filed as to conduct which could lead to dismissal under the University’s regulations.” Opinion at 42-43. The court explained that San Filippo received all such information on June 9, 1989, pursuant to Rutgers’ compliance with section 1.1 of a Stipulation dated May 19,1989. Second, the court concluded:
These [nine] charges together caused plaintiffs dismissal and it is only that tenured faculty member who had “been known to commit” or was “accused of committing” offenses of the kind, number, and scope taken together with whom plaintiff is truly “similarly situated.” No one suggests that such a person exists.
Opinion at 44-45 (emphasis in original). For these two reasons, the court concluded that San Filippo had received all of the discovery to which he was entitled. See Opinion at 46.
San Filippo, with support from the Rutgers AAUP, argues that the district court abused its discretion in denying San Filippo’s request for a Rule 56(f) continuance. Under Contractors Assoc. v. City of Philadelphia, 945 F.2d 1260 (3d Cir.1991), whether a Rule 56(f) motion should be granted “depends, in part, on ‘what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained.’ ” Id. at 1266 (quoting Lunderstadt v. Colafella, 885 F.2d 66, 71 (3d Cir.1989)). A district court has discretion in acting on Rule 56(f) motions. See id. at 1267. However, where relevant information sought is in the hands of the moving party, “a district court should grant a Rule 56(f) motion almost as a matter of course unless the *433 information is otherwise available to the non-movant.” Id.
In Contractors Assoc., the district court granted Contractors Association of Eastern Philadelphia and other trade associations summary judgment on their claim that Philadelphia’s public contract minority set-aside law violated the equal protection clause of the fourteenth amendment. On appeal, United Minority Associates Enterprises argued that the district court — to which Minority Associates had submitted a Rule 56(f) affidavit along with their opposition to summary judgment — erred by granting the summary judgment motion without giving Minority Associates an opportunity to pursue discovery on the existence of discrimination in the Philadelphia construction market that could justify various set-asides. We held that the district court abused its discretion by not granting a continuance before ruling on the summary judgment motion. See Contractors Assoc., 945 F.2d at 1268.
In addressing the first part of the Contractors Assoc, test — what information is sought and how it would preclude summary judgment — San Filippo and the Rutgers AAUP argue that the district court’s definition of “similarly situated” was too narrow. We agree. Among other things, San Filippo argues that, but for his protected activity, he would not have been charged at all. To limit his discovery to individuals who were in fact brought up on similar charges is, therefore, not adequately responsive to San Filippo’s needs. Nor should San Filippo be limited to discovery of individuals who committed nine charges of comparable seriousness yet were not disciplined. The Supreme Court explained in McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 283 n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976):
[Pjrecise equivalence in culpability between employees is not the question. As we indicated in [McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973) ], an allegation that other “employees involved in acts against [the employer] of comparable seriousness ... were nevertheless retained ...” is adequate to plead an inferential case that the employer’s reliance on his discharged employee’s misconduct as grounds for terminating him was merely a pretext.
Santa Fe, 427 U.S. at 283 n. 11, 96 S.Ct. at 2580 n. 11 (emphasis and omissions in Santa Fe).
In analogous fashion, this court, in Bennun v. Rutgers State University, 941 F.2d 154 (3d Cir.1991), rejected a contention that the district court had erred in comparing the defendant University’s decision not to tenure the plaintiff professor with the University’s decision to tenure another professor who had higher ratings than the plaintiff in two categories — teaching effectiveness and general usefulness. See id. at 178. We reasoned that to preclude such a comparison “would change ‘similarly situated’ to ‘identically situated.’ ” Id. Although “[t]he propriety of such a comparison is ease specific,” there is a “broad sweep of relevancy.” Id. Admittedly, the district court may and should impose limits on discovery that is calculated to lead to the unearthing of only marginally relevant evidence. Nonetheless, the limits imposed here were too severe.
The Board indicated in its opinion that it viewed charges 1(a), 1(d) and 1(e) as the most serious charges against San Filippo, meriting his dismissal even if the other charges were not sustained. San Filippo accordingly should be permitted to discover whether the University knew of other employees who committed one or more offenses of comparable or greater seriousness yet did not discipline these employees, or imposed sanctions far less severe than dismissal. Although the district court’s suggestion that San Filippo was disciplined because of a combination of misdeeds rather than for any single misdeed is plausible, this type of evaluation is one that should generally be left to the fact-finder. Because the information San Filippo sought in discovery was of the sort that might prevent the entry of summary judgment and was under the control of Rutgers, we conclude that it was an abuse of discretion to deny San Filippo’s Rule 56(f) motion. Accordingly, we will vacate the district court’s grant of summary judgment on *434 San Filippo’s first amendment claim and remand for further discovery.[10]
Even without further discovery, there is sufficient evidence in the record from which a fact-finder could conclude that, in the absence of his protected activities, San Filippo would not have been dismissed based on the conduct described in the charges against him. First, Dean Edelstein was interviewed by the local New Brunswick newspaper, The Home News, shortly after San Filippo was dismissed. The paper reported: “ ‘If [San Fi-lippo] had behaved better earlier in terms of his relations with his colleagues,’ said Tilden Edelstein, Dean of the Faculty of Arts and Sciences, San Filippo might have been treated differently_ ‘But San Filippo persisted in being “Joe the Warrior,”’ Edelstein said.” [A. 606]. A fact-finder could reasonably infer that the “war” to which Dean Edelstein referred encompassed the protected complaints San Filippo had made over the years. In addition, Walter Wechsler, the member of the Board of Governors who dissented from the decision to dismiss San Fi-lippo, stated that “the punishment is clearly out of proportion to his alleged wrongdoing, and quite possibly tainted by a long history of animus.” (A. 322).
San Filippo also has presented evidence that other faculty members had committed infractions of comparable seriousness yet had not been punished. For example, Professor Richard Hartwick of the chemistry department testified before the Senate Panel that he had had two students pitch hay for him on his farm. Another professor, George Muha, testified that, as a student, he had helped his faculty advisor move from one place to another. Professor Muha also testified that he had some of his own students work with him in his photography lab, and that foreign students he had invited to his house at Thanksgiving did domestic chores including yard work for him. Based on this evidence, a fact-finder could reasonably find that San Filippo would not have been dismissed in the absence of his protected activities. Accordingly, even if the denial of the Rule 56(f) motion were not erroneous, we would vacate the grant of summary judgment.
In light of our decision to vacate the district court’s grant of summary judgment on San Filippo’s first amendment claim, we need to address certain other issues that are relevant to the course of proceedings on remand.
A. Protected activity
As explained above, one who alleges retaliatory discharge from governmental employment must establish that the conduct which triggered the discharge was protected under the first amendment. Where the alleged retaliation is based on expressive conduct constituting speech, a court must first determine whether or not the speech can be fairly characterized as addressing a “matter of public concern,” for a governmental employee who makes public complaints about problems not of “public concern” has no first amendment immunity against employer discipline. Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).[11] But San Filippo’s expressive conduct was not limited to speech. It included the filing both of lawsuits, and also of grievances under a *435 collective bargaining agreement, against the University and University officials — activities that implicate the petition clause, rather than the free speech clause, of the first amendment.[12]
The magistrate judge concluded that San Filippo’s activities impheating the petition clause were protected by the first amendment regardless of whether the “petition” at issue addressed a matter of public concern. The district court disagreed, and held that, to qualify for first amendment protection, San Filippo’s “petition” activities must meet the Connick “public concern” threshold. Although the district court concluded that some of San Filippo’s speech addressed matters of public concern,[13] the court concluded that his lawsuits and grievances did not meet that threshold.
On appeal, San Filippo and the Rutgers AAUP recognize that the right to petition, like freedom of speech, is not absolute. They argue that San Filippo’s lawsuits and grievances were protected first amendment activities, regardless of content, unless they were baseless. Rutgers contends that the district court correctly held that San Filippo’s lawsuits and grievances were protected under the petition clause only if they addressed matters of public concern.[14]
In Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064 (3d Cir.1990), we expressly declined to reach the question whether a public employee is protected under the petition clause against retaliation for having filed a petition addressing solely a matter of private concern. See id. at 1076. We now will address that question.
Although the Supreme Court has not discussed the scope of the constitutional right to petition in the context of an allegedly retaliatory discharge of a public employee, the Court has had occasion to consider the scope of that right in other contexts.
In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court addressed the question whether a publicity campaign by railroads intended to encourage legislation and law enforcement practices disadvantageous to the trucking industry violated the Sherman Act. First, the Court took note of the established principle that, if a restraint of trade is caused by otherwise valid governmental action, there is no Sherman Act violation. See id. at 135-36, 81 S.Ct. at 528-29. Then, the Court went on to hold that the Sherman Act does not prohibit two or more persons from working together in an attempt to persuade the government to take a particular action that would restrain trade. See id. at 136, 81 S.Ct. at 528-29. The Court based its decision upon two grounds. First, the Court reasoned that nothing in the legislative history of the Sherman Act indicated an intent to regulate political activity by narrowing the channels through which citizens communicate with their governing officials. See id. at 137, 81 S.Ct. at 529-30. The Court then added:
Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, *436 and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.
Id. at 138, 81 S.Ct. at 529-30. Moreover, the Court rejected the contention that there was a Sherman Act violation because the railroads’ purpose was to destroy the trackers as competitors:
There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this is certainly not the case here. No one denied that the railroads were making a genuine effort to influence legislation and law enforcement practices.
Id. at 144, 81 S.Ct. at 533. Accord, United Mine Workers v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965).[15]
In California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court developed the “mere sham” exception to petition clause protection suggested in the Noerr dictum. Competitors of highway carriers regularly brought administrative and judicial proceedings to challenge the earners’ applications for operating rights. The highway carriers filed a complaint alleging that their competitors conspired to monopolize trade by instituting actions before administrative agencies and courts to defeat the carriers’ applications to acquire operating rights. See id. at 509, 92 S.Ct. at 611. The complaint further alleged that the competitors instituted the proceedings to oppose the carriers’ applications without regard to the merits of the cases, in an effort to prevent the carriers from having meaningful access to the agencies and courts. See id. at 511, 92 S.Ct. at 612. The Supreme Court held that the district court improperly dismissed the complaint for failure to state a claim under the antitrust laws. The Court first reiterated the holding in Noerr that “no cause of action [is] alleged insofar as it [is] predicated upon mere attempts to influence the Legislative Branch for the passage of laws or the Executive Branch for their enforcement.” Id. at 510, 92 S.Ct. at 911. The Court further stated:
The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. The right of access to the courts is indeed but one aspect of the right of petition.
We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors.
Id. at 510-11, 92 S.Ct. at 612 (citations omitted). Nonetheless, the Court held that the conduct described in the carriers’ complaint fell within the “sham” litigation exception described in Noerr and thus stated a claim under the antitrust laws.
The unprotected status of “sham litigation” was again recognized in Bill Johnson’s Restaurants Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), in which the Court announced that “baseless litigation is not immunized by the First Amendment right to petition.” Id. at 743, 103 S.Ct. at 2170. In Bill Johnson’s Restaurants, a waitress who was fired filed an unfair labor practice charge. She and other waitresses also picketed the restaurant, which in turn filed a complaint in state court seeking both damages and an injunction against the picketing. The waitress then filed a second charge with the Board, alleging that the restaurant had *437 filed the state action in retaliation for her exercise of rights under the National Labor Relations Act and seeking to have the restaurant’s state action enjoined. The Board issued a cease-and-desist order to halt the allegedly retaliatory state court lawsuit, and the Ninth Circuit affirmed.
The issue before the Supreme Court was whether, under section 8 of the NLRA, the Board may issue a cease-and-desist order to halt a state court suit solely upon a showing that the suit was filed for a retaliatory purpose, or whether the suit must also lack merit. The Court recognized that the Board’s position — that the suit need only be filed for a retaliatory purpose — found support in the broad remedial provisions of the Act. However, the Court concluded:
There are weighty countervailing considerations ... that militate against allowing the Board to condemn the filing of a suit as an unfair labor practice and to enjoin its prosecution. In California Motor Transport, we recognized that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances. Accordingly, we construed the antitrust laws as not prohibiting the filing of a lawsuit, regardless of the plaintiffs anticompetitive intent or purpose in doing so, unless the suit was a “mere sham” filed for harassment purposes. We should be sensitive to these First Amendment values in construing the NLRA in the present context.
Id. at 741, 103 S.Ct. at 2169 (citations omitted). The Court held that suits lacking a reasonable basis do not fall within the scope of first amendment protection. The Court explained:
The first amendment interests involved in private litigation — compensation for violated rights and interests, the psychological benefits of vindication, public airing of disputed facts — are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims. Furthermore, since sham litigation by definition does not involve a bona fide grievance, it does not come within the first amendment right to petition.
Id. at 743, 103 S.Ct. at 2170 (internal quotation omitted). Accordingly, the Court concluded that it is an enjoinable labor practice under § 8 of the NLRA to file a baseless lawsuit with the intent’ of retaliating against an employee for the exercise of rights protected by the NLRA. See id.[16]
In both Smith v. Arkansas State Highway Employees, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam) and Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984), the Court held that the petition clause does not require the government to respond to every communication that the communicator may denominate a petition. In Smith, the Arkansas State Highway Commission refused to consider grievances filed by a union on behalf of employees, and would respond only to grievances filed by individual employees themselves. In Knight, a state statute required public employers to respond to union representatives, but not to individual employees. In both cases, the Court held that there was no petition clause violation. The Knight Court, which described the challenged conduct as the converse of conduct challenged in Smith, rejected the employees’ claim that “they have a right to force officers of the State acting in an official policy-making capacity to listen to them in a particular formal setting.” Knight, 465 U.S. at 282, 104 S.Ct. at 1065.
Most recently, in McDonald v. Smith, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985), the Court addressed the question whether the petition clause provides absolute immunity to a defendant charged with defaming the plaintiff in a letter about the plaintiff written to the President of the United States. Smith, an unsuccessful aspirant for appointment as United States Attorney, *438 brought a libel suit against McDonald, alleging that McDonald had written two letters to Ronald Reagan — the first when Mr. Reagan was President-elect, the second a month after his inauguration — accusing Smith of, among other things, fraud, extortion, and civil rights violations. The Court held that the petition clause does not provide absolute immunity in that context; rather, a petitioner whose communications are defamatory may be answerable in libel if he is shown to have acted with malice, as defined in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In reaching this conclusion, the Court observed:
The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression....
To accept petitioner’s claim of absolute immunity would elevate the Petition Clause to special First Amendment status. The Petition Clause, however, was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. These First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions.
McDonald, 472 U.S. at 482, 485, 105 S.Ct. at 2791 (citations omitted).
As the arguments advanced in the briefs in the case at bar make clear, the Supreme Court cases we have just canvassed, while long on nuance, do not yield an easily identified single common denominator.
San Filippo and the Rutgers AAUP would have us regard San Filippo’s petitions as activities protected under the first amendment unless those petitions were “mere shams” or “baseless litigation.” They stress that none of the very narrow limitations the Supreme Court has placed on the right to petition involves an examination of the content of the petition. They also argue that the petitions at issue in Noerr and Pennington did not address matters of public concern, and therefore those cases implicitly rejected the proposition that petitioning is protected under the first amendment only if the petition addresses a matter of public concern. The Rutgers AAUP contends that “there is every reason that the lines drawn around the right to petition in public employment be the same as those drawn for selfish petitioners everywhere.” That is, the Rutgers AAUP would have us define the contours of the right to petition without consideration of the context in which that right is exercised.
In contrast, Rutgers argues — we think persuasively — that “[t]he nature of the limitation upon the petition right depends upon context.” Rutgers contends that the Supreme Court cases analyzing the extent of the petition right in the antitrust, labor law and libel contexts are not necessarily instructive in the case at bar, which concerns the ability of a government employer to dismiss an employee for filing lawsuits and grievances against the employer. This argument that the scope of the petition right depends upon the context in which the right is exercised is particularly persuasive because the scope of the free speech right — a right that, like the petition right, is stated in unqualified terms in the first amendment — depends on the context in which that right is exercised.[17]
*439 That the scope of the right to petition depends upon context does not, however, mandate the further conclusion that the “public concern” threshold of Connick should limit the right to petition in the context of a government employer’s ability to discipline a public employee. The general question posed by the case at bar is whether — notwithstanding the dicta from McDonald quoted above — there are contexts in which the petition clause protects values additional to those protected by the speech clause.
McDonald is a ease in which the petition clause protects no value that is not protected by the speech clause. The petition at issue in McDonald was a letter to the President. Smith and Knight instruct that not every communication which the writer denominates a “petition” imposes on the government agency or official addressed an obligation to respond. See Knight, 465 U.S. at 285, 104 S.Ct. at 1066; Smith, 441 U.S. at 465, 99 S.Ct. at 1828. Accordingly, it is difficult to distinguish in any meaningful way between words contained in a letter to the President and words contained in, for example, an advertisement appearing in the New York Times. This difficulty presumably was the underpinning of the McDonald Court’s holding that McDonald’s words about a public figure should not be immunized simply because they appeared in a letter characterized as a “petition.” Moreover, the reasons for holding that the first amendment does not immunize maliciously defamatory falsehoods contained in a newspaper advertisement equally justify holding that the first amendment does not immunize maliciously defamatory falsehoods contained in a letter to the President. There is no value in a petition that seeks to influence the President by means of false statements. As in the context of speech, the additional requirement that malice be shown before liability may be imposed avoids overdeterrence.
The same difficulty in drawing a meaningful distinction between the speech found in the petition at issue in Schalk v. Gallemore, 906 F.2d 491 (10th Cir.1990) (per curiam) and other employee speech underlies the holding of that ease. Schalk, a hospital employee, had hand-delivered to the hospital board members a four-page letter describing her concerns about various management practices at the hospital. Schalk was formally reprimanded for complaining about matters unrelated to her area of responsibility. The reprimand indicated that Schalk would be discharged if she made further complaints of this nature. After Schalk told a board member that she wanted to meet with the board to discuss concerns akin to those described in her letter, she was terminated. Schalk then filed a lawsuit alleging that she was fired for writing a letter to, and later speaking with, board members about management practices, in violation of her first amendment speech and petition rights.
The Tenth Circuit first held that Schalk’s letter and her comments to the board member addressed a matter of public concern. Id. at 496. In a brief analysis of Schalk’s petition clause claim, the court stated: “In the instant case, Schalk’s right to petition is inseparable from her right to speak. As such, we see no reason to subject this claim to a different sort of analysis.” Id. at 498 (citing McDonald). As in McDonald, because the “petition” at issue was simply a letter imposing on the government no obligation to respond, it was properly analyzable under the conventional Connick rubric applicable to speech.
The case at bar is unlike Schalk in the sense that what San Filippo characterizes as “petitions” are not letters to the government-employer, but lawsuits and grievances directed at the government-employer or its officials. Submissions of this sort purport to invoke formal mechanisms for the redress of grievances.[18] Notwithstanding this distinc *440 tion, each circuit court to consider the issue has held that a public employee who alleges that he or she was disciplined in retaliation for having filed a lawsuit against his or her employer does not state a claim under § 1983 unless the lawsuit addressed a matter of public concern.[19] Recognizing that the question is a difficult one, we find ourselves unable to subscribe to the reasoning of our sister circuits.
Of these circuits, the Seventh Circuit has addressed the issue in the most detail. In Altman v. Hurst, 734 F.2d 1240 (7th Cir.1984) (per curiam), decided before McDonald, the Seventh Circuit held that a police officer who alleged that he was reassigned, denied overtime opportunities and otherwise harassed in retaliation for filing a lawsuit against his employer addressing matters of private concern did not state a claim under § 1983. The court explained:
Several Supreme Court cases indicate that the first amendment protects a person’s right to seek judicial redress of grievances. See NAACP v. Button, 371 U.S. 415, 429 [83 S.Ct. 328, 335-36, 9 L.Ed.2d 405]. A close reading of these cases clearly shows that the Court was concerned about political expression and not the general right to bring suit in a federal court of law. See, e.g., Button, 371 U.S. at 429 [83 S.Ct. at 335-36]. (“In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means of achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this county. It is thus a form of political expression.”). This formulation dovetails with the Connick rule that limits the first amendment protection given public employees to pronouncements on public issues. Thus, a private office dispute cannot be constitu-tionalized merely by filing a legal action.
Id. at 1244 n. 10 (some citations omitted).[20] That is, the Seventh Circuit explicitly rejected the proposition that the petition clause *441 protects access to the courts for any reason other than that the courts may serve as fora for expression. In Belk v. Town of Minocqua, 858 F.2d 1258, 1261-62 (7th Cir.1988), the Seventh Circuit relied on McDonald as further support for its holding that a public employee may be terminated in retaliation for filing a grievance unless the grievance addressed a matter of public concern. The Belk court stated:
Notwithstanding the central importance Connick attaches to the content of a public employee’s speech, Belk asks us to accord absolute first amendment protection, without regard to content, to any grievance a public employee files or threatens to file. Not only is there no legal or historical precedent for such a stratification of first amendment freedoms, as McDonald suggests, but such special treatment o£ the right to petition would unjustly favor those who through foresight or mere fortuity present their speech as a grievance rather than in some other form.
Id. at 1262 (emphasis in original). Again, affording special treatment to speech found in a grievance is “unjust” only if no independent reason exists for affording special protection to a mechanism for redress of grievances against the government.
There is an additional argument for testing a public employee’s lawsuits against his or her employer by the Connick public concern threshold not made in the Seventh Circuit cases: namely, that the governmental interests which led the Court to impose the public concern threshold on employee speech would appear to justify imposing a similar threshold on employee lawsuits and grievances. Under Connick, employers are able to discipline their employees for speech unless the speech addresses a matter of public concern. The rationale for this distinction is that it represents an effort to seek “a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Connick, 461 U.S. at 142, 103 S.Ct. at 1687. The Supreme Court recently elaborated on the basis for authorizing the government as employer to exercise broader power in regulating the speech of its employees than the government as sovereign may exercise in regulating the speech of the general public:
[T]he extra power the government has in this area comes from the nature of the government’s mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency’s effective operation begins to say or do things that detract from the agency’s effective operation, the government employer must have some power to restrain her. The reason the government may, in the example given above, fire the [high-ranking] deputy [who criticizes her state governor’s legislative program] is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor’s staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more efficiently.
The key to First Amendment analysis of government employment decisions, then, is this: The government’s interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a relatively significant one when it acts as employer. The government cannot restrict speech of the public at large just in the name of efficiency.' But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.
Waters v. Churchill, — U.S.-,-, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994).
We recognize that employee lawsuits and grievances against a public employer can, on occasion, be divisive in much the same way that employee speech can be. Nonetheless, we believe that there is an independent reason — a reason of constitutional dimension— to protect an employee lawsuit or grievance *442 if it is of the sort that constitutes a “petition” within the meaning of the first amendment.
The first amendment’s petition clause imposes on the United States an obligation to have at least some channel open for those who seek redress for perceived grievances. Through its incorporation of the first amendment, the fourteenth amendment’s guarantee of “liberty” imposes the same obligation on the states. Smith and Knight stand only for that proposition that neither the United States nor the several states are required to recognize as a “petition” whatever particular communication is so characterized by one who chooses to protest governmental acts or omissions. But when government — federal or state — formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution’s vital purposes to hold that one who in good faith files an arguably meritorious “petition” invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur. We do not share the Seventh Circuit’s apprehension that not applying the Connick “public concern” standard to retaliatory dismissal of a public employee who files a “petition” would constitute “special treatment of the right to petition [that] would unjustly favor those who through foresight or mere fortuity present their speech as a grievance rather than in some other form.” Belk, 858 F.2d at 1262. As applied to communications that are not petitions, the Connick rule means that a public employee who goes public — e.g., by writing to The New York Times — with an employment dispute that is not of “public concern” runs the risk of being disciplined by her public employer for undertaking to draw public attention to a private dispute. But when one files a “petition” one is not appealing over government’s head to the general citizenry: when one files a “petition” one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair.[21]
One example of formal governmental adoption of a mechanism for redress of grievances is entry into a collective bargaining agreement that provides for a grievance procedure. Another example of formal governmental adoption of such a mechanism is waiver of sovereign immunity from suit in the courts of that sovereign. If government could, qua employer, freely discharge an employee for the reason that the employee, in order to present a non-sham claim against the government-employer, invoked such a mechanism, the petition clause of the first amendment would, for public employees seeking to vindicate their employee interests, be a trap for the unwary — and a dead letter.
The petition clause of the first amendment was not intended to be a dead letter — or a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press. To be sure, “the right to petition,” as *443 the Court noted in McDonald, “is cut from the same cloth as the other guarantees of that Amendment_” 472 U.S. at 482, 105 S.Ct. at 2789. But the Court in McDonald also stressed that the right to petition “is an assurance of a particular freedom of expression.” Ibid. More to the point, the right to petition has a pedigree independent of — and substantially more ancient — -than the freedoms of speech and press. The Court pointed out in McDonald that “[T]he historical roots of the Petition Clause long antedate the Constitution. In 1689, the Bill of Rights exacted of William and Mary stated: ‘[I]t is the Right of the Subjects to petition the King.’ 1 Wm. & Mary, Sess. 2, ch. 2.” Ibid.[22] But of particular moment for the issue before us is that Parliament, in the Bill of Rights, not only declared the right of subjects “to petition the King,” but went on to provide that “all committments [sic ] and prosecutions for such petitioning are illegal.” 1 W. & M., 2d Sess., e. 2, § 5, 16 Dec. 1689. The right to petition and its attendant, and indispensable, immunity from “committments and prosecutions”[23] were, in the Court’s felicitous phrase, “exacted of William and Mary,” McDonald, 472 U.S. at 482, 105 S.Ct. at 2790, in 1689. That was precisely one hundred years before the first Congress charged with implementing America’s new Constitution submitted to the states, for ratification, proposed amendments to that Constitution permanently establishing in American law the right of petition and other fundamental rights. There is no persuasive reason for the right of petition to mean less today than it was intended to mean in England three centuries ago.
On remand, the district court should consider which, if any, of San Filippo’s grievances and lawsuits constituted a “petition,” and whether any such “petition” was non-sham. The mere act of fifing a non-sham petition is not a constitutionally permissible ground for discharge of a public employee.
B. Substantial factor
Our decision to vacate the grant of summary judgment on San Filippo’s first *444 amendment claim also requires us to consider Rutgers’ argument that, contrary to the district court’s conclusion, it was entitled to summary judgment because San Filippo cannot show that his protected conduct “was a substantial factor in the alleged retaliatory action.” Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir.1983).
The district court explained that courts have drawn an inference of retaliation based on the nearness in time between the protected activity and a discharge. Although the district court believed that no fact-finder could reasonably infer that San Filippo’s protected activities in 1977-1979 and 1983-84 were a substantial factor motivating his dismissal, the court concluded that San Filippo was brought up on charges and dismissed sufficiently soon after he made protected statements in or around 1986[24] to raise an inference of retaliation.[25]
At the outset, we disagree with the district court’s view that San Filippo’s protected activities in 1977-79 and 1983-84 were too far removed in time to support any inference of retaliation. Although a dismissal that occurs years after protected activity might not ordinarily support an inference of retaliation, where, as here, a plaintiff engages in subsequent protected activity and the plaintiff is dismissed shortly after the final episode of such protected activity, a fact-finder may reasonably infer that it was the aggregate of the protected activities that led to retaliatory dismissal. This inference would be particularly strong if the plaintiff can show that the decisionmaker lacked a pretext on which to dismiss the plaintiff until shortly before the time of dismissal.
Rutgers argues that the temporal proximity between San Filippo’s protected activities and the disciplinary proceedings against him cannot, by itself, support an inference that the protected activity was a substantial factor in the alleged retaliatory action. We need not address this argument, however, because San Filippo has additional evidence to support his allegation that he was dismissed in retaliation for his protected activity. The evidence described above as support for San Filippo’s position that he would not have been dismissed absent his protected activities — the statements of Dean Edelstein and Board of Governors member Wechsler and the evidence that other faculty members committed infractions of comparable seriousness yet went unpunished — equally support his position that his protected conduct was a substantial factor motivating his dismissal. On the basis of this evidence, we conclude that a fact-finder could reasonably find that San Filippo’s protected conduct was a substantial factor motivating his dismissal.
Rutgers next argues that San Filippo is inappropriately seeking to impute to the members of the Board of Governors the improper motives of those responsible for bringing charges against him. Rutgers contends that, under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S.Ct. 915, 923-24, 99 L.Ed.2d 107 (1988), the University can only be held hable if the Board members personally determined to dismiss San Filippo on the basis of his first amendment activities or knowingly acquiesced in the decision to do so by approving both the decision and the allegedly improper basis for it. But this, according to San Filippo, is too narrow a standard of liability: in San Filippo’s view, the University should be held hable if the fact-finder concludes that (a) the charges against San Filippo were initiated in retaliation for the exercise of his first amendment rights and (b) the Board members were “deliberately indifferent” to that fact.
In Monell, the Supreme Court held that, although municipalities and other local governing bodies can be sued under 42 U.S.C. *445 § 1983, liability cannot be imposed on such an entity on a theory of vicarious liability for the torts of the entity’s employees. Rather, a local governing body can be held hable only for an official policy or custom. See Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38. A single decision by a final policy-maker, as defined by state law, may constitute official policy. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986). Rutgers argues that the Board of Governors is the only final policy-maker in this case, and that the Board did not have a retaliatory motive when it voted to dismiss San Filippo.
San Filippo contends that he need only show that the Board members were “deliberately indifferent” to the fact that he had been brought up on charges in retaliation for the exercise of his first amendment rights. He relies on City of Canton, Ohio v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), in which the Supreme Court held that Canton’s failure to train police officers to give medical attention could be a basis for imposing § 1983 liability if “the failure to train amounted] to deliberate indifference to the rights of persons with whom the police [came] into contact.” Id. at 388, 109 S.Ct. at 1204. The Canton Court explained that the use of the deliberate indifference standard was most consistent with the Court’s “admonition in Monell that a municipality can be liable under § 1983 only where its policies are the ‘moving force [behind] the constitutional violation.’ ” Id. at 388-89, 109 S.Ct. at 1204-05 (citations omitted).
The Tenth Circuit extended Canton to a situation analogous to the case at bar in Ware v. Unified School Dist. No. 492, 902 F.2d 815 (10th Cir.1990). The plaintiff in Ware served as clerk to a school board and secretary to the superintendent of the school district. She alleged that her superintendent had recommended to the board that she be dismissed in retaliation for her protected speech, and that the board had acted with deliberate indifference to her first amendment rights in approving the termination. The Ware court rejected the board’s argument that Canton be limited to its facts, and held:
There is evidence in the record to support Ware’s claim that the Board acted with deliberate indifference to her First Amendment rights in approving her termination. ... The record contains evidence that board members knew about Ware’s public stand on the bond issue and were informed of her belief that her termination was in retaliation for that stand.... Notwithstanding the above indications that the board knew [the superintendent’s] recommendation was in retaliation for Ware’s position on the bond issue, the board made no independent investigation, asked [the superintendent] no questions about the reasons for his decision.... The evidence is sufficient to create a jury question on whether the board acted with deliberate indifference to Ware’s First Amendment rights in approving [the superintendent’s] recommendation.
Id. at 819-20.
We agree with the Tenth Circuit that its application of the deliberate indifference standard of Canton is most consistent with the “ ‘admonition in Monell that a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation.’ ” Ware, 902 F.2d at 819 (quoting Canton, 489 U.S. at 388-89, 109 S.Ct. at 1204U05) (citations omitted). Nor is this use of the deliberate indifference standard inconsistent with City of St. Louis v. Praprotnik, 485 U.S. 112, 124, 108 S.Ct. 915, 924-25, 99 L.Ed.2d 107 (1988) (plurality opinion). Praprotnik recognized that final decision-making power may be delegated, and that a local governing body may be held liable based upon the exercise of this delegated power. See id. at 124, 108 S.Ct. at 924-25. But the Court added:
Simply going along with discretionary decisions made by one’s subordinates, however, is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the *446 supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a “custom or usage” of which the supervisor must have been aware.... But the mere failure to investigate the basis of a subordinate’s discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate’s decision arises from a retaliatory motive or other unstated rationale.
Id. at 130, 108 S.Ct. at 927-28. In addition to holding that the “mere failure to investigate the basis of a subordinate’s discretionary decisions” does not make the subordinate a final policy-maker, the Praprotnik Court also implicitly held that the local governing body is not liable for the mere failure to investigate by the final policy-maker.
Our use of a “deliberate indifference” standard does not make the University liable for the Board’s mere failure to investigate — that is, the University would not be liable if, oblivious to the motivation behind the decision to charge San Filippo and to initiate dismissal proceedings, the Board had decided to dismiss San Filippo for wholly legitimate reasons. Such a scenario would not amount to deliberate indifference of the Board to San Filippo’s first amendment rights. The scenario described by San Filippo, however, goes beyond that of an oblivious Board failing to investigate.
San Filippo presented to the district court evidence that the Board had reason to suspect that San Filippo’s prior protected activities had been a substantial motivating factor in the decision to initiate dismissal proceedings. As the magistrate judge noted, “the record is replete with evidence which indicates that the information regarding San Filippo’s protected activities was well known to the individual members of the Board.” (A.2152 n. 15). Moreover, Wechsler’s dissenting opinion discloses awareness at the level of the Board of San Filippo’s contention before the Senate Panel that other faculty members had had students perform uncompensated work for them, yet were not disciplined. (A.325). Finally, the Board’s opinion recognizes that San Filippo’s attorney, Ira Goldberg, had argued that “the charges brought against Professor San Filippo were fabrications based on a personal ‘vendetta’ against him by members of his Department.” (A.304). As in Ware, this evidence suffices to create a question for the fact-finder regarding whether the ultimate decision-maker acted with deliberate indifference to the plaintiff’s first amendment rights by approving the recommendation that the plaintiff be dismissed.[26]
III. San Filippo’s procedural due process claim
San Filippo also asks us to vacate the district court’s grant of summary judg *447 ment on his procedural due process claim. San Filippo argues that his due process rights were violated because the five members of the Senate Panel that conducted the hearings and recommended that he be dismissed were not impartial decision-makers and because the proceeding was tainted by the appearance of impropriety. Specifically, San Filippo alleges in his Third Amended Complaint:
[The] members of the panel were negotiating with the Rutgers Administrator chiefly responsible for supervising the prosecution of the case for additional compensation, thus giving them a financial incentive in the outcome of the proceedings, in that they reasonably would believe that they would get additional compensation only if their final decision was favorable to the Administrator. Furthermore, all the contacts for such additional compensation were held in secret, thus leading to the appearance of impropriety on the part of the Panel.
Both the magistrate judge and the district court rejected San Filippo’s argument that a fact-finder could reasonably infer that the panel members believed they were more likely to be compensated if they recommended that San Filippo be dismissed. In addition, the magistrate judge and district court rejected San Filippo’s argument that the “secret” negotiations about compensation created an appearance of impropriety. We agree with the conclusions reached by the magistrate judge and district court.
The Senate Panel was composed of five faculty members, chosen by lot after for-eause and peremptory challenges, whose responsibility was to hold hearings and determine whether the charges brought against San Filippo were true and constituted grounds for his dismissal. The panel had twelve meetings after it convened on December 5, 1986 and before the evidentiary hearings began. Between March 24, 1987 and September 22, 1987, the panel devoted forty-six days to evidentiary hearings. After closing arguments, the panel held another twelve meetings before it produced a forty-four page report on December 21, 1987. Throughout the hearings, San Filippo was represented by two attorneys, Ira and Pamela Goldberg, and a union counsellor provided by the Rutgers AAUP, Dr. Wells Keddie.
With the knowledge and consent of San Filippo’s attorneys, Dr. Keddie, on March 5; 1987, sent a memorandum to the panel chair, Dr. Szatrowski, copied to San Filippo and his attorneys. The memorandum suggested various ways to deal with time and scheduling problems:
I don’t have a single original or good idea as to how to resolve the time bind, but there are some things which might mitigate the impact upon the committee members. One of them is the course you are already pursuing, the seeking of some relief from normal duties while this demanding activity proceeds. It seems to me that if the proceedings cannot be concluded by the May 15 date, it would be entirely appropriate to request the equivalent of Summer Session pay for all of you or released time for those of you (yourself) on “summer vacation” in the upcoming trimester. But another possibility might well be worth considering: released time after this is all over to enable committee members to make up for considerable lost time, energy, and opportunity.
Dr. Keddie also suggested that panel members “be provided meals and accommodations.”
When it became clear that the hearings would not conclude before commencement, Szatrowski asked San Filippo’s attorney, Ira Goldberg, if he had any objection to Szatrow-ski asking Dr. Susan Cole, Vice President for University Administration and Personnel, for summer compensation for the panel members. Szatrowski and Goldberg both testified in their affidavits that Goldberg voiced no objection and wished Szatrowski “good luck.”
When Szatrowski first requested additional compensation and/or released time in the spring of 1987, Cole denied the request because she believed that the panel members were already under an obligation to participate without extra compensation. In late spring, Szatrowski renewed the request in light of the length of the hearings and the fact that certain panel members were ordi *448 narily not required to be in attendance at Rutgers over the summer. By letters dated July 29, 1987, Cole granted the members their requested extra compensation and release time. San Filippo was not told of this decision.
Shortly after the summer increases were granted, Szatrowski asked Cole for further additional compensation when it became clear that the hearings would continue into the fall. Cole testified that when Szatrowski approached her about the matter of further payments, she “told him when the panel was finished with its business, that we could discuss the matter again.” Szatrowski similarly testified:
When I asked if this [the refusal to grant more compensation] meant that regardless of the amount of additional time spent on this matter by the panelists while carrying out their normal duties, there would be no further consideration for additional compensation in the future, Dr. Cole indicated that there would be no consideration possible until after the completion of the hearings.
Ultimately, after the panel issued its final report recommending that San Filippo be dismissed, Cole recommended that the panel members receive extra compensation.
Based upon this factual scenario, San Fi-lippo alleges that the panel members would have been tempted to reach an outcome in Rutgers’ favor because they would have believed that they were more likely to get extra compensation if they did so. We agree with the magistrate judge and district court that there is insufficient evidence to support an inference that the faculty members believed that their receipt of compensation was tied to the outcome of the proceedings. The cases cited by San Filippo are cases in which the adjudicator had a direct financial interest in the outcome. See, e.g., Tumey v. Ohio, 273 U.S. 510, 531, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927) (mayor acting as judge shared in the fees and costs levied by him); Ward v. Village of Monroeville, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972) (mayor responsible for village finances could not act as judge when fines and forfeitures provided substantial portion of village funds). The Supreme Court has held that the impermissible pecuniary interest must be realistic and more than “remote.” Marshall v. Jerrico, Inc., 446 U.S. 238, 250, 100 S.Ct. 1610, 1617, 64 L.Ed.2d 182 (1980). We find no evidence in the record to support a conclusion that the panel members believed that they were more likely to be compensated if they recommended San Filippo’s dismissal.'
San Filippo alternatively argues that the panel members’ participation in the hearings while negotiating for additional compensation created an appearance of impropriety. See Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) (arbitration panel “not only must be unbiased but must also avoid the appearance of bias”). Under Commonwealth Coatings, to prevail on an “appearance of impropriety” due process claim, San Filippo must establish both that the events in question would cause one to reasonably question the panel’s impartiality and that the information was concealed from San Filippo. San Filippo makes much of the fact that he was not told about the meetings between Szatrowski and Cole; however, in light of the fact that Keddie suggested that Szatrowski broach the subject of extra compensation, these meetings do not have the invidious character San Filippo suggests.
Finally, San Filippo argues that he should have had the opportunity to depose Szatrow-ski to determine what was said in the conversations between Szatrowski and Cole. San Filippo contends that, although he noticed Szatrowski’s deposition in August 1989, all discovery was stayed after November 1989 when the motions for summary judgment were filed. As the district court noted, San Filippo has failed to explain why Szatrowski was not deposed before August 1989 — particularly, why he was not deposed during the summer and fall of 1989 when San Filippo deposed nine other current and former officials and employees of Rutgers. Moreover, San Filippo does not indicate how he expects the deposition testimony of Szatrowski to differ from the testimony found in Szatrow-ski’s affidavit, dated April 2,1990. For these reasons, we conclude that the district court did not abuse its discretion by refusing to *449 delay decision on the summary judgment motions until San Filippo had a chance to depose Szatrowski.
IV. Conclusion
For the foregoing reasons, we affirm in part and vacate in part the order of the district court. We affirm the district court’s grant of summary judgment in Rutgers’ favor on San Filippo’s due process claim. We vacate the district court’s grant of summary judgment in Rutgers’ favor on San Filippo’s first amendment claim, and remand for proceedings consistent with this opinion.

. The Rutgers AAUP is the recognized agent for collective bargaining under state law for Rutgers University faculty members, including Professor San Filippo. The Rutgers AAUP, as an affiliate of the national organization, also serves as a professional organization for the Rutgers University faculty.

. The Senate Panel found that charge 1(b) was unproven, and the Board concurred in this determination.

. The Senate Panel did not sustain charge 3(a), and the Board concurred in this determination.

. Charge 3(c) was not sustained by the Panel, and the Board concurred in this determination.

. The Senate Panel sustained this charge in regard to Mr. Peng Zhou, but not in regard to Mr. Cong-Yuan Guo. The Board concurred in both determinations.

. The parties agree that the analysis is the same under the first amendment and equal protection claims. From this point, we refer to these claims as the first amendment claim.

.The burden of persuasion shifts to Rutgers with respect to the third prong of this test. In this respect, the retaliatory discharge test differs from *431 the Title VII rule established in Texas Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and reaffirmed in St. Mary's Honor Center v. Hicks, -U.S. -, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), where the burden of persuasion remains on the plaintiff even after he or she has proved a prima facie case, and the employer need only articulate — not prove — a non-discriminatory reason for its actions.

. Rule 56(f) states in relevant part:
Should it appear from the affidavit of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit ... discovery to be had or may make such other order as is just.

. The text of this rule is quoted at note 8, supra.

. With respect to the second part of the Contractors Assoc, test — why the information was not previously obtained — Rutgers argues that the May 19, 1989 Stipulation precluded further discovery. This argument is unpersuasive. We agree with the district court’s conclusion that the Stipulation did not necessarily foreclose additional discovery.

. A public employer is not precluded altogether from dismissing an employee for speech addressing a matter of public concern. Rather, a public employer may dismiss an employee for speech addressing a matter of public concern if the state's interest, as an employer, in promoting the efficiency of its operations outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. Connick, 461 U.S. at 142, 103 S.Ct. at 1687. This balancing test comes into play only if the public employer concedes that it dismissed an employee because of the employee's protected speech but contends that it was justified in doing so. Rutgers denies that it dismissed San Filippo for his protected activities; accordingly, the balancing test has no application in the case at bar.
The court decides, as a matter of law, whether the speech at issue addressed a matter of public concern and whether the state's interest in efficiency outweighed the employee’s interest in commenting on matters of public concern. See Holder v. City of Allentown, 987 F.2d 188, 195 n. 2 (3d Cir.1993).

. The first amendment states in relevant part:
Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.
United States Constitution, Amend. 1.

. The district court concluded that the following items of speech addressed matters of public concern: (1) San Filippo's 1979 statement in a school newspaper criticizing Rutgers for inadequate ventilation in the chemistry labs; (2) San Filippo’s testimony, in 1977 and 1978, before a grand jury, regarding an investigation into the manufacture of illegal drugs in Rutgers’ laboratories; (3) San Filippo’s criticisms, in 1983-84, of his faculty peers’ attempt to secure funding for a mass spectrometer by deceiving federal funding agencies; and (4) San Filippo’s disputes between 1979 and 1986 with senior members of his department over their efforts to obtain “inappropriate percentages” of his federal grants.

.The district court’s conclusion that San Filip-po engaged in some protected activity does not make this dispute academic. San Filippo wants, (a) the fact-finder to be instructed that dismissal in retaliation for any or all of his lawsuits and grievances constitutes a first amendment violation, and (b) to argue to the fact-finder that the close proximity in time between his 1985 lawsuits and the decision to file formal charges against him supports an inference of retaliation.

. In Pennington, coal operators and a labor union had approached the Secretary of Labor and the Tennessee Valley Association regarding the minimum wage for contractors selling coal to the TVA. The Court reaffirmed the holding of Noerr that ''[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.” 381 U.S. at 670, 85 S.Ct. at 1593.

. Following Bill Johnson’s Restaurants in Hoeber on behalf of the NLRB v. Local 30, 939 F.2d 118 (3d Cir.1991), this court held that the district court properly denied the NLRB’s request that the court enjoin a pending lawsuit brought by a labor union for breach of contract. We explained that two factors must be present before an injunction against a civil lawsuit may issue: the plaintiff must have an improper motive for bringing the suit, and the suit must have no reasonable basis. See Hoeber, 939 F.2d at 126.

. San Filippo and the Rutgers AAUP rely upon cases from contexts other than public employment/retaliatory discharge in support of the argument that a lawsuit is protected — regardless of content — unless it is baseless. Most significantly, San Filippo contends that our decision in Hoeber on behalf of the NLRB v. Local 30, 939 F.2d 118 (3d Cir.1991) forecloses Rutgers’ position. As explained in note 16, supra, in Hoeber we held, following Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983), that a court may not enjoin a pending lawsuit as an unfair labor practice unless the plaintiff had an improper motive for bringing the suit and the suit had no reasonable basis. See Hoeber, 939 F.2d at 126. San Filippo argues that, because the breach of contract lawsuit at issue in Hoeber appeared to address only matters of private concern, the case supports his argument that his lawsuits and grievances addressing only matters of private concern are protected under the petition clause. We disagree. Because this case does not arise in the public employment/retaliatory discharge context, it is not on point.
Many other cases cited by San Filippo and the AAUP are similarly inapposite because they arise in other contexts. See, e.g., Milhouse v. Carlson, 652 F.2d 371, 373 (3d Cir.1981) (disciplinary proceedings allegedly brought against a prisoner *439 in retaliation for having filed a civil rights lawsuit); Goff v. Burton, 7 F.3d 734, 736 (8th Cir.1993) (same); Smith v. Maschner, 899 F.2d 940 (10th Cir.1990) (same); Wright v. Newsome, 795 F.2d 964 (11th Cir.1986) (same); Duvall v. Sharp, 905 F.2d 1188 (8th Cir.1990) (arrest allegedly made in retaliation for filing a civil rights lawsuit).

. Lawsuits, grievances, workers compensation claims, etc. share this feature of invoking a formal mechanism for redress of grievances against the government. We occasionally use the term “lawsuit” to encompass any device invoking a mechanism for redress of grievances against the government.

. See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir.1993); Day v. South Park Independent Sch. Dist., 768 F.2d 696, 703 (5th Cir.1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986); Rathjen v. Litchfield, 878 F.2d 836, 842 (5th Cir.1989); Rice v. Ohio Dep’t of Transportation, 887 F.2d 716, 720-21 (6th Cir.1989), vacated on other grounds, 497 U.S. 1001, 110 S.Ct. 3232, 111 L.Ed.2d 744 (1990); Altman v. Hurst, 734 F.2d 1240, 1244 n. 10 (7th Cir.1984) (per curiam); Belk v. Town of Minocqua, 858 F.2d 1258, 1261-62 (7th Cir.1988); Gearhart v. Thorne, 768 F.2d 1072, 1073 (9th Cir.1985) (per curiam); Renfroe v, Kirkpatrick, 722 F.2d 714, 715 (11th Cir.) (per curiam), cert. denied, 469 U.S. 823, 105 S.Ct. 98, 83 L.Ed.2d 44 (1984). Cf. Boyle v. Burke, 925 F.2d 497, 505-06 (1st Cir.1991) (dicta). But see Fuchilla v. Prockop, 682 F.Supp. 247, 262 (D.N.J. 1987), (reading California Motor Transport to support the holding that a public employee may not be retaliated against for filing a lawsuit regardless of whether the lawsuit addressed a matter of public concern).

. The Seventh Circuit reiterated this sentiment in Yatvin v. Madison Metropolitan School Dist., 840 F.2d 412 (7th Cir.1988):
The contention that every act of retaliation against a person who files charges of wrongdoing with a public agency denies freedom of speech or the right to petition for redress of grievances rests on the following syllogism: litigation is a method recognized by the Supreme Court, as in NAACP v. Button, 371 U.S. 415, 429-31 [83 S.Ct. 328, 335-37, 9 L.Ed.2d 405] (1963), for advancing ideas and seeking redress of grievances; retaliation against one who institutes litigation (or its condition precedent in Title VII litigation, the lodging of charges with civil rights agencies) discourages litigation; therefore such retaliation invades a First Amendment right. The weakness is the first premise, which is stated too broadly. Some litigation seeks to advance political or other ideas; litigation by the NAACP seeking to eliminate public school segregation is an example. And even when litigation has private rather than public objectives, communications designed to acquaint individuals with their legal rights are within the scope of the First Amendment. But not every legal gesture — not every legal pleading — is protected by the First Amendment. Remedies against baseless litigation do not violate the First Amendment's right to petition; nor do laws aimed at deterring 'far out' suits by requiring the loser to pay the winner's legal fees.
Id. at 419, 83 S.Ct. at 330-31 (citations omitted). Because the court concluded that Yatvin's sex discrimination claim against her employer had purely private objectives, the court rejected Yat-vin’s claim that her employer's retaliation violated the petition clause. Id. at 419-20, 83 S.Ct. at 330-31. This conclusion may, however, be regarded as dictum because the court also held that Yatvin's first amendment claim was foreclosed by her failure to raise the claim below with sufficient particularity. See id. at 420, 83 S.Ct. at 331.

. Like the Seventh Circuit in Belk, our dissenting colleague draws comfort from the Supreme Court's observation in McDonald that the first amendment right to petition and the first amendment “freedoms to speak, publish and assemble ... are inseparable” and hence "there is no sound basis for granting greater constitutional protection to statements made in a petition to the President than other First Amendment expressions." 472 U.S. at 485, 105 S.Ct. at 2791. But it is important to note that the Court’s language in McDonald was addressed to a question very different from the question presented in Belk and the case at bar. In McDonald the question was whether one who was defamed in a letter was disabled from suing the letter-writer by virtue of the fact that the letter was written to the President and thus could be characterized as a “petition” within the meaning of the first amendment. In holding that the letter-writer was amenable to suit at the hands of the person defamed, under the same state law standards, compatible with New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that would have applied had the letter been written to a newspaper, the Court was not called upon the consider the question presented in the case at bar — namely, whether the addressee of a "petition” (in McDonald, the President) could sanction the letter-writer for pursuing a constitutionally charted pathway of communication with government.
It is also worthy of note that the letter-writer in McDonald apparently did not limit the audience for his defamatory efforts to President Reagan. The letter-writer allegedly also saw fit to send copies of one or both of the letters to Senator Jesse Helms, three members of the House of Representatives, and the then Director of the Federal Bureau of Investigation, William Webster, as well as then Presidential Adviser Edwin Meese. 472 U.S. at 481, 105 S.Ct. at 2789.

. The remote antecedents of the right of petition trace back to Magna Carta, chapter 61 of which provides:
... if we or our justiciar, or our bailiffs, or any of our servants shall have done wrong in any way toward any one, or shall have transgressed any of the articles of peace or security; and the wrong shall have been shown to four barons of the aforesaid twenty-five barons, let those four barons come to us or to our justic-iar, if we are out of the kingdom, laying before us the transgression, and let them ask that we cause that transgression to be corrected without delay.
But of course the right lukewarmly acknowledged by King John was exercisable only by his barons.

. The critical importance of Parliament’s declaration that it was “illegal” to penalize a subject "for such petitioning” was made plain by Blackstone in his celebrated Commentaries, the series of law books best known to American lawyers of the late eighteenth and early nineteenth centuries:
If there should happen any uncommon injury, or infringement of the rights before mentioned, which the ordinary course of law is too defective to reach, there still remains a fourth subordinate right, appertaining to every individual, namely, the right of petitioning the king, or either house of parliament, for the redress of grievances. In Russia we are told that the czar Peter established a law, that no subject might petition the throne till he had first petitioned two different ministers of state. In case he obtained justice from neither, he might then present a third petition to the prince; but upon pain of death, if found to be in the wrong: the consequence of which was, that no one dared to offer such third petition; and grievances seldom falling under the notice of the sovereign, he had little opportunity to redress them. The restrictions, for some there are, which are laid upon petitioning in England, are of a nature extremely different; and, while they promote the spirit of peace, they are no check upon that of liberty. Care only must be taken, lest, under the pretence of petitioning, the subject be guilty of any riot or tumult, as happened in the opening of the memorable parliament in 1640: and, to prevent this, it is provided by the statute 13 Car. II. st. I, C. 5, that no petition to the king, or either house of parliament, for any alteration in church or state, shall be signed by above twenty persons, unless the matter thereof be approved by three justices of the peace, or the major part of the grand jury in the country; and in London by the lord mayor, aldermen, and common council: nor shall any petition be presented by more than ten persons at a time. But, under these regulations, it is declared by the statute I W. and M. st. 2, c. 2, that the subject hath a right to petition; and that all commitments and prosecutions for such petitioning are illegal.
1 William Blackstone, Commentaries *143.

. The court presumably was referring to San Filippo's disputes with senior members of his department over their efforts to obtain "inappropriate percentages" of his federal grants, and particularly his complaint to the University in October, 1985 about the chemistry department's attempts to divert funds improperly from his federal grants under the guise of a "shop-user's fee." See page 427, supra. San Filippo was orally informed of the charges against him in November, 1985.

. The activities found by the district court to address matters of public concern are described briefly at note 13, supra.

. The Supreme Court's recent decision in Waters v. Churchill, -U.S. -, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) provides additional support for our use of the Canton "deliberate indifference” standard in the case at bar. In Waters, the Court addressed the question whether the Connick test should be applied to what the government employer thought the employee said, or to what the fact-finder ultimately determines was said. The Court took an intermediate position, holding that a court should accept the employer's factual conclusions, but only if the employer was reasonable in arriving at those conclusions. Id. at -, 114 S.Ct. at 1881. In elaborating on what would constitute reasonable conduct by an employer, the Court explained:
If an employment action is based upon what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should, however, be the care that a reasonable manager would use before making an employment decision — discharge, suspension, reprimand, or whatever else — of the sort involved in the particular case. Justice Scalia correctly points out that such care is not normally constitutionally required unless the employee has a protected property interest in her job, but we believe that the possibility of inadvertently punishing someone for exercising her First Amendment rights makes such care necessary.
Id. at-, 114 S.Ct. at 1881. By holding that the University may be held liable if a fact-finder finds that the Board of Governors was deliberately indifferent to the possibility that dismissal proceedings were initiated against San Filippo in retaliation for the exercise of his first amendment rights, we similarly require his employer to "tread with a certain amount of care” to avoid “the possibility of inadvertently punishing someone for exercising [his] First Amendment rights.”